UNITED STATES DISTRICT COUR
FOR THE DISTRICT OF COLUMBIA

------------------------------------------X

LASHAWN A. by her next friend, Evelyn
Moore (1618B Beekman Place NW, Washing-
ton, DC 20009); DEMERICK B. by his next
friend Dr. Owen Rennert, (10300 Bells
Mill Terrace, Potomac, Maryland 20854);
GARY AND LEO C. by their next friends,
Crystal and Wesley Brown, (6101 16th
Street NW, Washington, DC 20011); ROBERT
D. by his next friend, Daryl Anette
Chamblee (1856 Plymouth Street NW, Wash-
ington, DC 20012); KEVIN E. by his next
friend, Elizabeth Velez (3240 McKinley
Street NW, Washington, DC 20015); TYRONE
F. by his next friends, Eva Nash (307
18th Street, NE, Washington, DC 20018)
and Anatasia Holmes (1630 Underwood St.
NW, Washington, DC 20012), on their own
behalf and on behalf of all others
similarly situated,

                      Plaintiffs,

    v.

MARION BARRY, JR., as Mayor of the Dis-
trict of Columbia (District Building,
Suite 520, 1350 Pennsylvania Avenue NW,
Washington, DC 20004); PETER G. PARHAM,
as Director of the District of Columbia
Department of Human Services (Suite 700,
801 North Capitol Street NE, Washington,
DC 20002); BARBARA BURKE-TATUM, as
Commissioner of the Commission on Social
Services of the District of Columbia
Department of Human Services (609 H
Street NE, 5th Floor, Washington, DC
20002); JEAN R. HUNTER, as Acting Admin-
strator of the Family Services Administ-
tration of the District of Columbia
Department of Human Services (Randall
Building, Room 213, 1st & Eye Street SW,
Washington, DC 20024); and EVELYN P.
ANDREWS, as Acting Chief of the Child and
Family Services Division of the District
of Columbia Department of Human Services
(609 H Street NE, 4th Floor East, Wash-
ington, DC 20002),

                      Defendants.

------------------------------------------X

89- 1754

**FILED**

JUN 20 1989

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**COMPLAINT FOR INJUNCTIVE RELIEF**

HOGAN, J. TFH



E

## INTRODUCTION

1.  This is a civil rights action brought on behalf of children who have been placed in foster care under the supervision of the District of Columbia's Department of Human Services and on behalf of children have been abused or neglected and who are or should be known to the Department by virtue of that abuse or neglect. The Department has systematically denied the plaintiff children their rights under federal law, the United States Constitution, and the law of the District of Columbia.

2.  Constitutional principles, federal statutes and the law of the District of Columbia all mandate that the Department promptly investigate complaints of neglect and abuse, that it make reasonable efforts to keep families together whenever possible by offering services, that it provide appropriate care to children it has taken into foster care, and that it provide permanent homes for children either by returning them to their own families or by finding them adoptive homes.  The District of Columbia Department of Human Services is complying with none of these mandates.

3.  The child-welfare system in Washington is in an ongoing state of crisis as severe as that experienced by many of the homes from which the system is removing children.  Worker caseloads are many times larger than that permitted by professional standards, abuse reports go uninvestigated, ninety-day "emergency care" lasts for years, workers and foster parents are untrained, foster homes are overcrowded and unsupervised, planning for children is

1

nonexistent, children are "controlled" by inappropriate use of medication, specialized placements are virtually nonexistent and thus children with special needs often are shipped out to institutions in distant states, and no services are provided to families to enable children to be returned home safely nor are efforts made to find new permanent homes for children.   One tragic result of this systemic chaos is that children who enter foster care in the District of Columbia remain there an average of nearly five years, more than three times the national average.

4.  The District of Columbia child-welfare system operates in violation of federal statutes, constitutional provisions, and the law of the District of Columbia.  These violations result directly from the defendants' actions and inactions and are irreparably injuring children for whom the Department of Human Services is responsible.

## JURISDICTION AND VENUE

5.   This is an action pursuant to section 1983 of title 42 of the United States Code alleging violations of federal statutes as well as of the United States Constitution.  In addition the action alleges violations of statutes of the District of Columbia.  The district court has jurisdiction over the federal claims pursuant to sections 1331 and 1343(a)(3) of title 28 of the United States Code, and it has pendent jurisdiction over the claims alleging violations of the statutes of the District of Columbia.

6.    Venue in this district is proper pursuant to section 1391(b) of title 28 of the United States Code because the claims arise in the district.

CLASS ACTION ALLEGATIONS

7.    This action is properly maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.

8.    The plaintiff class encompasses the approximately 2,500 children who, as the result of an allegation of abuse or neglect or as the result of suspected abuse or neglect, are in the legal and/or physical custody of the District of Columbia Department of Human Services as well as the thousands of children who are not in the Department's legal or physical custody but have been the victims of neglect or abuse of which the Department knows or should know or are at risk of neglect or abuse of which the Department knows or should know.

9.    The named plaintiffs are adequate representatives of the proposed class.  The violations of law alleged by the named plaintiff children are typical and representative of violations that pervade the District's foster-care system and thus that pertain to the class members.  Further, the harms suffered by the named plaintiffS are representative of the harms suffered by the class members.

10.     The questions of law and fact common to the proposed class include the following: (1) whether the defendants' actions and inactions violate the rights conferred upon the plaintiff children by the federal Adoption Assistance and Child Welfare Act of 1980; (2)  whether the defendants' actions and inactions violate the rights conferred upon the plaintiff children by the due process clause of the fifth amendment to the United States Constitution; (3) whether the defendants' actions and inactions violate the rights conferred upon the plaintiff children by the District of Columbia Prevention of Child Abuse and Neglect Act of 1977; (4) whether the defendants' actions and inactions violate the rights conferred upon the plaintiff children by the federal Child Abuse Prevention and Treatment Act; and (5) whether the defendants' actions and inactions violate the rights conferred upon the plaintiff children by the District of Columbia Youth Residential Facilities Licensure Act of 1986.

11.     The named plaintiffs will fairly and adequately protect the interests of the class.  The named plaintiffs are represented by, among others, attorneys employed by the Children's Rights Project of the American Civil Liberties Union, a privately funded national organization with extensive experience in complex class-action, child-welfare litigation.  Counsel have the resources, expertise, and experience to prosecute this action.  Plaintiffs appear by next friends who are responsible and respected citizens working or living in the District of Columbia.  Counsel for the plaintiffs know of no conflicts among members of the class.

4

## NAMED PLAINTIFFS

12. Plaintiff LASHAWN A. is a four-year-old girl who came into the custody of the District of Columbia Department of Human Services on or about September 15, 1986. She currently resides in a foster home located in the District of Columbia.

13. Plaintiff LASHAWN A. appears in this action by her next friend, Evelyn Moore. Ms. Moore is Executive Director of the National Black Child Development Institute in the District of Columbia.

14. Plaintiff DEMERICK B. is a three-year-old boy who came into the custody of the District of Columbia Department of Human Services on or about July 15, 1986. He currently resides in St. Ann's Infant and Maternity Home in Hyattsville, Maryland.

15. Plaintiff DEMERICK B. appears in this action by his next friend, Dr. Owen Rennert. Dr. Rennert is a professor and chairman of the Department of Pediatrics at Georgetown University Hospital.

16. Plaintiff GARY C. is a six-year-old boy who originally came into the custody of the District of Columbia Department of Human Services on or about November 16, 1982. He currently resides in a foster home located in Maryland.

17. Plaintiff LEO C., the brother of plaintiff GARY C., is a five-year-old boy who originally came into the custody of the

5

District of Columbia Department of Human Services on or about
June 28, 1984.  He currently resides in a foster home located in
Maryland.

18.  Plaintiffs GARY and LEO C. appear in this action by their
next friends, Crystal and Wesley Brown.  Ms. Brown is an educator
and Mr. Brown is an engineer who is retired from his position at
Howard University.

19.  Plaintiff ROBERT D. is an eleven-year-old boy who came into
the custody of the District of Columbia Department of Human
Services on or about July 24, 1985.  He currently resides in a
foster home in the District of Columbia.

20.  Plaintiff ROBERT D. appears in this action by his next
friend, Daryl Anette Chamblee.  Ms. Chamblee is a partner in the
Washington, D.C., law firm of Steptoe and Johnson.

21.  Plaintiff KEVIN E. is a nine-year-old boy who came into the
custody of the District of Columbia Department of Human Services
on or about August 20, 1979.  He currently resides at Villa
Maria, a residential-care facility in Timonium, Maryland.

22.  Plaintiff KEVIN E. appears in this action by his next
friend, Elizabeth Velez.  Ms. Velez teaches in the English
Department at Georgetown University.

23. Plaintiff TYRONE F. is an eight-year-old boy who came into the custody of the District of Columbia Department of Human Services on or about February 24, 1987. He currently resides in Friendship House, a residential-care facility in Scranton, Pennsylvania.

24. Plaintiff TYRONE F. appears in this action by his next friends, Eva L.W. Nash and Anastasia M. Holmes. Ms. Nash, a social worker, is a retired division director at the United States Department of Health and Human Services, and Ms. Holmes is a teacher and librarian.

<u>DEFENDANTS</u>

25. MARION BARRY, JR., is sued in his official capacity as the Mayor of the District of Columbia. As Mayor, Mr. Barry is responsible for the policies, practices, and operation of the Child and Family Services Division of the District of Columbia Department of Human Services.

26. PETER G. PARHAM is sued in his official capacity as the Director of the District of Columbia Department of Human Services. As Director, Mr. Parham is responsible for the policies, practices, and operation of the Child and Family Services Division of the District of Columbia Department of Human Services.

27. BARBARA BURKE-TATUM is sued in her official capacity as the Commissioner of the Commission on Social Services of the District of Columbia Department of Human Services. As

7

Commissioner, Ms. Burke-Tatum is responsible for the policies, practices, and operation of the Child and Family Services Division of the District of Columbia Department of Human Services.

28.    JEAN R. HUNTER is sued in her official capacity as the Acting Administrator of the Family Services Administration of the District of Columbia Department of Human Services.  As Acting Administrator, Ms. Hunter is responsible for the policies, practices, and operation of the Child and Family Services Division of the District of Columbia Department of Human Services.

29.    EVELYN P. ANDREWS is sued in her official capacity as the Acting Chief of the Child and Family Services Division of the District of Columbia Department of Human Services.  As Acting Chief, Ms. Andrews is responsible for the policies, practices, and operation of the Child and Family Services Division of the District of Columbia Department of Human Services.

<u>THE ADMINISTRATIVE FRAMEWORK</u>

30.    The District of Columbia Department of Human Services is an umbrella social-services agency that has overall responsibility for the planning, implementation, and administration of health and social-service programs in the District of Columbia. Defendant Peter G. Parham is the Director of the Department, and he was appointed to that position by defendant Marion Barry, Jr. on or about October 21, 1988.

2-1357; D.C. Code Ann. §§ 6-2101 to 6-2107; D.C. Code Ann. §§ 6-2111 to 6-2119; D.C. Code Ann. §§ 6-2121 to 6-2127; and D.C. Code Ann. §§ 16-2351 to 16-2365); (3) the federal Child Abuse Prevention and Treatment Act (codified at 42 U.S.C. §§ 5101-5106); and (4) the District of Columbia Youth Residential Facilities Licensure Act of 1986 (codified at D.C. Code Ann. § 3-801 to 3-808).

35.   The federal Adoption Assistance and Child Welfare Act of 1980 and the District of Columbia plan for compliance with the Act submitted to and approved by the Secretary of Health and Human Services in order for the District of Columbia to obtain funding pursuant to the Act, confers various rights upon children who are in the foster-care custody or are at risk of entering the foster-care custody of government agencies that receive funding pursuant to the Act.

36.  The federal Adoption Assistance and Child Welfare Act of 1980 requires that reasonable efforts be made to provide services to enable children to remain with their families or to be returned to their families whenever possible; that all children in foster care have written case plans developed and reviewed within specified time periods; that these plans contain specified elements; that appropriate services be provided to children, their parents, and their foster parents to address each child's needs and to assure each child's permanent placement; that each child receive proper care; that the homes or institutions in which children are placed conform with national standards and

31.    The Department of Human Services is comprised of three Commissions, one of which is the Commission on Social Services. Defendant Barbara Burke-Tatum is the Commissioner of the Commission on Social Services, and she was appointed to that position by defendant Marion Barry, Jr. on or about September 30, 1988.

32.    The Commission of Social Services is comprised of five Administrations, one of which is the Family Services Administration.   Defendant Jean R. Hunter is the Acting Administrator of the Family Services Administration.

33.    The Family Services Administration is comprised of three Divisions, one of which is the Child and Family Services Division.   This Division operates the District's foster-care system; defendant Evelyn P. Andrews is the Acting Chief of the Child and Family Services Division.

## THE STATUTORY FRAMEWORK

34.    In addition to alleging that the defendants are violating their constitutional rights, the plaintiff children allege that the defendants are violating statutory rights conferred upon the plaintiffs by four substantive statutes:  (1) the federal Adoption Assistance and Child Welfare Act of 1980 (codified as amended at 42 U.S.C. §§ 670-679 and 42 U.S.C. §§ 620-627); (2) the District of Columbia Prevention of Child Abuse and Neglect Act of 1977 (codified as amended at D.C. Code Ann. §§ 2-1351 to

9

that foster care payments are appropriate; that children be placed in the least restrictive, most familylike setting; that children receive periodic judicial or administrative reviews, and that children receive dispositional reviews to determine their future status no later than 18 months after placement.

37.   The District of Columbia Department of Human Services receives substantial funds pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.

38.   The District of Columbia Prevention of Child Abuse and Neglect Act of 1977 also confers a panoply of rights upon the plaintiff children.  The Act requires that the Department attempt to obviate the need for removal of a child from his or her home by first offering services to the family, where appropriate; that the Department prepare for each child about whom a report of abuse or neglect is verified a plan to provide services to the child and the family so as to address the abuse or neglect; that the Department "maintain a program of treatment and services for families of neglected and abused children"; that the Department, in those cases in which it has removed a child from his or her home, "offer rehabilitative services to the child's family" that will allow for reunification of the child and the family; and that the Department, in those instances in which it has removed a child from his or her home and in which reunification is not appropriate, "prepare a permanent plan for the child."  In addition, the District Act mandates, among other things, that the District initiate within no more than 24 hours investigations

into reports of abuse or neglect; that it take specific steps to assure that children who cannot return to their biological families be adopted promptly; and that the Department employ sufficient staff and supervisory personnel to meet its obligations under the Act.

39.   The federal Child Abuse Prevention and Treatment Act confers various rights upon children who, by virtue of abuse or neglect complaints, are or should be known to government agencies that receive funds pursuant to the Act.

40.   The federal Act requires the District to initiate prompt investigations into reports of abuse and neglect and to take appropriate steps to protect the children who are subjects of such reports.   Further, the Act mandates that the District have in place procedures, personnel, and facilities adequate to "deal effectively with child abuse and neglect cases."

41.   The District of Columbia Department of Human Services receives funds pursuant to the federal Child Abuse Prevention and Treatment Act.   In addition, the federal Adoption Assistance and Child Welfare Act requires compliance with the federal Child Abuse Prevention and Treatment Act.

42.   The District of Columbia Youth Residential Facilities Licensure Act of 1986 requires that all facilities in which foster children are placed be licensed in accord with regulations to be promulgated by defendant Marion Barry and that those

12

facilities be periodically inspected.  The Act also mandates the Department to develop for all children in residential institutions or group facilities individual treatment plans and further that it provide periodic reviews for those children. Finally, the Act requires the Department to develop, for each child being returned home from a residential institution or a group facility, "a comprehensive aftercare plan."

<u>THE NAMED PLAINTIFFS</u>

43.  Plaintiff LASHAWN A. is a four-year-old girl.  She entered the custody of the District of Columbia Department of Human Services on or about September 9, 1986, when her mother placed her in the Department's "emergency care" program because the mother was homeless.  Currently, LaShawn resides in a foster home located in Washington, D.C.

44.  Despite the fact that District law mandates that "emergency care" custody is to last no more than ninety days, LaShawn remained in emergency care for two and one-half years until March 27, 1989, when the Department filed a neglect petition against her mother.

45.  During the two and one-half years that she has been in the Department's custody, LaShawn has never had a case plan that complies with federal and District law or that meets minimum professional standards.  In the first six months that LaShawn was in custody there is no evidence that the Department developed any written case plan for her.  Since then the Department has

13

completed forms that purport to be case plans, but they lack the elements required by federal and District law or by minimal professional standards. For instance, forms completed in September 1987, identified the Department's planning goal for LaShawn as being to return her to her mother, but the only steps identified for attaining that goal were "set up a regular visitation schedule with [the mother]" and "assess [the mother's] ability to care for LaShawn."

46. Since the Department assumed responsibility for LaShawn in September 1986, the Department's planning goal for LaShawn has been to return her to her mother. During this period, however, the Department has not provided or offered to LaShawn's mother any services to address the neglect that initially justified LaShawn's custody nor has it done anything else that might make possible the return of LaShawn to her mother. Indeed, the Department had no contact, other than to attempt to arrange visits, with the mother for over 27 months between September 1986 and February 1989. In addition to its failure to determine whether or not LaShawn can ever be returned to her mother, the Department has failed to determine whether an alternative plan of adoption would be appropriate for her.

47. During the two-and-one-half years that she has been in custody, LaShawn never has had an administrative or judicial review, nor has she had a dispositional hearing.

48.  In June 1987 a psychiatrist who examined LaShawn discovered
potential serious psychiatric or psychological problems as well
as potential developmental problems and recommended in a written
report that LaShawn receive complete psychiatric and
psychological assessments.  Yet, it was not until a year and one-
half later in November 1988 that the Department arranged for
these assessments.

49.  The Department has violated LaShawn's federal and District
of Columbia statutory rights and her federal constitutional
rights by keeping her in emergency care for more than ninety
days, by failing to develop for her written case plans within
required time periods and case plans that contain the required
elements and that are likely to assure her permanent placement,
by failing to provide services or to make other efforts to
implement the Department's plan to return her home to her mother
or to consider and implement an alternative permanent plan, by
failing to provide her with proper care and adequate services, by
failing to provide her with periodic judicial and administrative
reviews, and by failing to provide her with a dispositional
hearing.

50.  As a result of these violations of her rights, LaShawn has
been deprived of the opportunity for healthy development and a
normal childhood and has been and continues to be irreparably
harmed.

51.    Plaintiff DEMERICK B. is a three-year-old boy.  He entered
the custody of the District of Columbia Department of Human
Services on or about July 15, 1986, when he was eleven months
old, after his mother signed him into emergency care.  Currently,
he resides in St. Ann's Infant and Maternity Home in Hyattsville,
Maryland.

52.    When Demerick entered the District's custody in July 1986,
the Department placed him at St. Ann's Infant and Maternity
Home, a short-term, emergency care facility.  Four months later
he was still at St. Ann's, and the facility warned the
Department that he should be moved to a foster home.  Since then
St. Ann's frequently has requested that the Department move
Demerick to an appropriate placement, and on December 13, 1988,
St. Ann's wrote to the District that "Demerick is suffering
emotionally and developmentally because of his prolonged
institutionalization.  He needs to be moved to a home setting as
soon as possible to prevent further emotional damage."  Despite
these repeated warnings, Demerick is still at St. Ann's.

53.    In the nearly three years that Demerick has been at St.
Ann's, the Department worker responsible for his case has never
visited him.

54.    After she signed him into emergency care in July 1986,
Demerick's mother never visited Demerick at St. Ann's.  In
November 1987 the Superior Court found her to have abandoned him,
and since at least August 1987 the Department's planning goal for

16

Demerick has been to have him adopted.  Yet, despite repeated requests from St. Ann's beginning as early as August 24, 1987, Demerick was not referred to the Department's adoption unit until late in 1988.

55.  In the nearly two years since the Department decided that adoption would be appropriate for Demerick, it has done virtually nothing to achieve this goal other than to list him on various adoption exchanges.

56.  The Department has violated Demerick's federal and District of Columbia statutory rights and his federal constitutional rights by keeping him in an overly restrictive and otherwise inappropriate congregate-care setting for nearly three years, by failing to develop and review written case plans that contain the required elements and by failing to take appropriate action to implement his plan, by failing to place him in the least restrictive, most familylike setting, by not providing him with proper care while he has been in the Department's custody, and by failing to take appropriate steps to assure his permanent placement in an adoptive home.

57.  As a result of these violations of his rights, Demerick has been deprived of the opportunity for healthy development and a normal childhood and has been and continues to be irreparably harmed.

58.   LEO and GARY C. are brothers who are six and five years old,
respectively.  Leo originally entered the custody of the
District of Columbia Department of Human Services on or about
November 16, 1982, when his mother signed him into emergency
care; Gary originally entered the custody of the Department on or
about June 28, 1984, when his mother signed him into emergency
care.  Currently, they reside in a foster home located in
Maryland.

59.  Between November 16, 1982, and March 6, 1987, the Department
repeatedly accepted Gary and Leo into emergency care and then
returned them to their mother.  Leo was signed into care four
times and was returned three times (accepted on or about November
16, 1982, and returned on or about May 31, 1983; accepted on or
about June 28, 1984, and returned on or about March 7, 1985;
accepted on or about June 19, 1985, and returned on or about
October 4, 1985; accepted on or about March 6, 1987), and Gary
was signed into emergency care three times and was returned twice
(accepted on or about June 28, 1984, and returned on or about
March 7, 1985; accepted on or about June 19, 1985, and returned
on or about October 4, 1985; accepted on or about March 6,
1987).  Throughout this period Gary and Leo's mother was
experiencing ongoing serious problems, yet the Department
continued to return the children to her even though it knew or
should have known that she was unable to care for them properly.
The Department also failed to make reasonable efforts to provide
services to these children's mother to avoid the need for Gary's
and Leo's repeated reentries into foster care.

60.   Despite the fact that District law mandates that emergency care custody is to last no more than ninety days, after Leo and Gary were signed into emergency care on or about March 6, 1987, they remained in that status for over twenty months, until November 15, 1988, when a neglect petition was filed against their mother.

61.   Since their reentry into the Department's custody in March 1987, neither Gary nor Leo has ever had a written case plan.

62.   Since their reentry into the Department's custody in March 1987, Gary and Leo have not received periodic administrative or judicial reviews nor have they received dispositional hearings.

63.   Since it assumed responsibility for Gary and Leo in March 1987, the Department planning goal has been to return them to their mother.   During this two-year period, however, the Department has not provided or offered any services to the mother that would allow her to reassume responsibility for the children; indeed, it has done nothing more than refer the mother to three sources of possible services.   In addition, the Department has done nothing to determine whether this mother will ever be able to resume responsibility for her children or to determine whether an alternative plan of adoption would be appropriate for these children.

64. On or about March 6, 1987, the Department placed Gary and Leo in St. Ann's Infant and Maternity Home, a congregate-care facility. On August 11, 1987, a psychiatrist who examined the children recommended that they promptly be placed in a setting in which they would get individual attention from a single caretaker. On November 19, 1987, a psychologist who examined the children again recommended that the children be moved out of St. Ann's and into an individual foster home. Despite these reports and despite the fact that St. Ann's is a short-term, emergency care facility, the Department kept Gary and Leo at St. Ann's for over twenty months, until November 30, 1988.

65. During the twenty months that Gary and Leo remained at St. Ann's, the Department worker responsible for their case never visited them.

66. During the prolonged period during which he was left at St. Ann's, Leo developed serious behavioral problems. When he entered the facility in 1987 Leo was a normal child with no unusual behavioral problems. Now, however, he has such serious behavioral problems that he is on the verge of being expelled from the elementary school he attends. And according to an October 1988 psychological evaluation, he is "harboring a great deal of anger, unfulfilled need for nurturing and fears of abandonment." The evaluation reports that Leo will require "ongoing counseling" and warns that without effective therapy "his aggressive behavior will escalate and continue as he gets older."

67.  Since they left St. Ann's on November 30, 1988, Leo and Gary have resided with a single foster parent.  Notwithstanding the October 1988 medical evaluation stating that Leo needs ongoing therapeutic services and despite repeated requests from the foster parent that he receive these services, the Department provided no such assistance to Leo for nearly three months after he left St. Ann's until the end of February, when he was enrolled in a once-a-week therapeutic nursery program.  Due to his behavioral problems, however, he was expelled from the program within a month, and another month passed before the Department arranged for substitute therapeutic services.  Currently, the only service being provided to Leo is weekly therapy.

68.  The Department has violated Gary and Leo's federal and District of Columbia statutory rights and their federal constitutional rights by failing to make reasonable efforts to offer services that could have prevented the need for their placement in foster care, by keeping them in emergency care longer than ninety days, by failing to place them in the least restrictive, most familylike setting for nearly twenty months, by failing to develop for them written case plans that contain the required elements or that are reasonably likely to assure their permanent placement, by not offering services that could allow them to return home, by failing to consider and to make efforts to implement an appropriate alternative permanent plan, by not providing them with proper care while in the Department's

custody, and by not providing them with periodic administrative
or judicial reviews.

69.  As a result of these violations of their rights, Gary and
Leo have been deprived of an opportunity for healthy development
and normal childhoods and have been and continue to be
irreparably harmed.

70.  ROBERT D. is an eleven-year-old boy.  He originally entered
the custody of the District of Columbia Department of Human
Services on or about January 25, 1980, after his mother
reportedly had abandoned him.  Currently, he resides in a foster
home located in the District of Columbia.

71.  On or about July 25, 1985, Robert's mother signed an
emergency care agreement, giving the Department temporary legal
custody of Robert.  Robert remained in emergency care for three
years and two months from July 1985 until September 1988, when a
neglect petition was filed against his mother.

72.  Since his entry into care in July 1985, the Department
planning goal for Robert has been to return him to his mother.
Yet, in a report submitted to the Family Division of the Superior
Court in September 1988, Robert's case worker stated that "it is
believed that [Robert's mother] will never be a resource for her
children," and the report indicates that the Department believed
this to be the case as early as 1982.

22

73. Despite the fact that the Department's planning goal is to return Robert to his mother, no social worker from the Department has visited Robert's mother in the last two years to assess her living situation, to assess her fitness to reassume responsibility for Robert, or to do any casework with her.  Since Robert's entry into Department custody in July 1985, the Department has provided no services or other assistance to Robert's mother that would allow her to reassume responsibility for him.  She specifically has requested homemaker services and mental health services.

74. In addition to its failure to determine whether or not Robert can ever be returned to his mother, the Department has failed to determine whether an alternative plan of adoption would be appropriate for him.

75. The Department has violated Robert's federal and District of Columbia statutory rights and his federal constitutional rights by keeping him in emergency care longer than ninety days, by failing to take reasonable steps to assure his permanent placement, by failing to develop for him written case plans that contain the required elements or that are reasonably likely to assure his permanent placement, by failing to provide services necessary and appropriate to make possible the Department's goal to return him home, and by failing to consider and to make efforts to implement an alternative permanent plan.

76. As a result of these violations of his rights, Robert has been deprived of an opportunity for healthy development and a normal childhood and has been and continues to be irreparably harmed.

77. KEVIN E. is a nine-year-old boy. He originally entered the custody of the Department of Human Services on or about August 20, 1979, when he was ten days old, after his teenaged mother signed him into emergency care. He currently resides at Villa Maria, a residential-care facility in Timonium, Maryland.

78. Since his entry into Department custody, Kevin has been in at least eleven different placements, including St. Ann's Maternity and Infant Home for over a year, at least five foster homes, one group home, St. Elizabeth's Hospital (twice), Children's Hospital, and Villa Maria, his present placement. During this period Kevin has been assigned at least seventeen different workers.

79. On August 25, 1982, Kevin was placed with his mother, who at the time also was in the Department's custody, at a group home. His mother abused him, however, punishing him excessively by forcing him to sit on the toilet and in the bathtub for long periods of time, striking him, and forbidding him from playing with other children in the home. As a result of this abuse, Kevin was separated from his mother on September 17, 1982.

24

80. In March 1984 the judicial order committing Kevin to the Department's custody lapsed as a result of the Department's carelessness. Rather than obtaining renewed legal custody of Kevin, the Department removed Kevin from the foster home he was in at the time and returned him to his mother even though it had no reason to believe that she would not abuse Kevin further or could care for him properly. Within a month of receiving Kevin from the Department, Kevin's mother signed him back into emergency care, and it was reported that during the period he was with his mother Kevin was neglected and possibly abused.

81. On or about August 11, 1988, the Department placed Kevin at Villa Maria, a residential-care facility in Timonium, Maryland. However, the Department failed to develop within thirty days of the decision to place him at Villa Maria the treatment plan required by District law; indeed, the Department has not developed any such plan.

82. The Department planning goal since at least January 15, 1986, has been to have Kevin adopted. Yet, Kevin has not even been referred to the adoption unit. The Department has made no effort to make him available for adoption or to have him adopted.

83. As early as November 1983 the Department worker responsible for Kevin's case noted that he exhibited "active behaviors and short attention span [that] interfere with his ability to learn and to use what he has learned." According to the worker's

report, "Disruptions and uncertainty in his life are a contributing factor," and she recommended "consistent structure and a stable environment." Since that report Kevin has been in seven different placements and has had numerous different workers. He now is diagnosed as suffering from several psychiatric disorders, including Oppositional Defiant Disorder, Attention Deficit Disorder, and Dsythmic Disorder. According to a February 1989 report "Kevin continues to have severe temper tantrums, low self esteem and poor peer relationships." His behavior has become so extreme that he has been institutionalized, and it is likely that this ten year-old child will experience serious behavioral problems for the remainder of his life.

84.     Since at least December 16, 1985 -- when he was six years old -- Kevin has received powerful psychotropic medications that are being used to control his behavior. The Department has responded to this child's behavioral problems by subjecting him to inappropriate medication instead of providing him with appropriate treatment and placement.

85. The Department has violated Kevin's federal and District of Columbia statutory rights and his federal constitutional rights by returning him to his mother when they knew or should have known that she could not care for him, by failing to make reasonable efforts to offer services that could have prevented the need for foster care, by failing to provide him with proper care, by failing to develop for him written case plans that contain the required elements or that are reasonably likely to

assure him permanent placement, and by failing during the ten years he has been in Department custody to make efforts to implement the Department's plan of adoption.

86.  As a result of these violations of his rights, Kevin has been deprived of the opportunity for healthy development and a normal childhood and has been and continues to be irreparably harmed.

87.  TYRONE F. is an eight-year-old boy.  He entered the custody of the District of Columbia Department of Human Services on or about February 24, 1987, as the result of an allegation that his mother had burned his hands.  Currently he resides in Friendship House, a residential-care facility in Scranton, Pennsylvania.

88.  Since coming into the Department's custody, Tyrone has suffered from serious psychological problems of which the Department has known.  Despite this, the Department placed Tyrone in three different foster homes in which the parents had neither the qualifications nor the training that would have enabled them to care for a child experiencing the psychological problems Tyrone has been experiencing nor were these foster parents offered necessary services to address this child's needs.  As a result of these inappropriate placements, Tyrone was removed from two of these foster home at the parents' request shortly after his placement.

89.   On or about July 20, 1987, the Department attempted to place Tyrone in St. Elizabeth's Hospital -- the District's psychiatric hospital -- despite the fact that he did not require hospitalization.   Only because of efforts by his guardian was Tyrone not placed at St. Elizabeth's.

90.   After its unsuccessful effort to place Tyrone at St. Elizabeth's, the Department placed Tyrone in another foster home. Within two days of this placement, however, the Department removed him simply because of paperwork problems relating to his placement.

91.   On or about July 22, 1987, the Department placed Tyrone at St. Ann's Infant and Maternity Home, a restrictive, residential-care facility that offers emergency, short-term placements for infants and a longer term program for teenage, pregnant mothers. At the time of his placement at St. Ann's, Tyrone was seven years old.   He remained there for six and one-half months until January 29, 1988.

92.   On or about February 5, 1988, the Department placed Tyrone at Friendship House, a restrictive, residential-care facility in Scranton, Pennsylvania.   On November 10, 1988, Friendship House reported that Tyrone did not need to be in a restrictive facility like Friendship House and stated further that continued placement there would be detrimental to him.   Tyrone is still residing at Friendship House.

93.    Since Tyrone entered custody in February 1987, the Department planning goal for him has been to return him to his mother.  During this two-year period, however, the Department has provided no services or other assistance to Tyrone's mother and has no reasonable basis to believe that she will not abuse Tyrone again or that she will be able to reassume responsibility for him.

94.    In addition to its failure to determine whether or not Tyrone can ever be returned safely to his mother, the Department has also failed to determine whether an alternative permanent plan would be appropriate for him.

95.    The Department has violated Tyrone's federal and District of Columbia statutory rights and his federal constitutional rights by repeatedly placing and keeping him in inappropriate and overly restrictive placements, by failing to develop and make efforts to implement written case plans that contain the required elements and that are reasonably likely to assure him permanent placement, by failing to provide services or to make other efforts to make possible the Department's planning goal of returning him to his mother, and by failing to prepare an aftercare plan to assist his mother in reassuming responsibility of him if he is returned to her.

96.    As a result of these violations of his rights, Tyrone has been and continues to be irreparably harmed.

97.    The problems presented by the named plaintiffs are typical of the problems experienced by the children who, as the result of an allegation of abuse or neglect or as the result of suspected abuse or neglect, are in the physical and/or legal custody of the District of Columbia Department of Human Services or by the thousands of other children not in the Department's custody but who have been the victims of neglect or abuse of which the Department knows or should know or are at risk of neglect or abuse of which the Department knows or should know.

<u>GENERAL FACTUAL ALLEGATIONS</u>

<u>Failure to Protect Children</u>

98.    The District of Columbia Department of Human Services is required by District and federal law to initiate within no more than 24 hours investigations in response to each report of neglect or abuse.  The Department does not comply with this requirement, however.  As of October 1988 the Department's Intake Branch, which is responsible for investigating reports, had a substantial backlog of reports that were awaiting investigation, and Department officials publicly acknowledged then that it took as long as five days to initiate many investigations.  The backlog continues to increase, with one worker alone having a backlog of approximately 50 reports.  One of the four supervisors in the Branch is carrying a full caseload and at least one of the other supervisors is carrying a partial caseload.  The entire branch has available to it only three cars, and some or all of them often are not working.  As a result of the Department's failure to initiate investigations into reports

of abuse or neglect promptly, children in the District of
Columbia are unnecessarily injured and are at continuing risk of
unnecessary injury or death.

99.  For years Department officials have been fully aware of the
problem of uninvestigated reports of neglect or abuse but have
willfully refused to hire the workers needed to remedy the
problem.  As early as February 1985 the Office of the District of
Columbia Auditor reported to defendant Marion Barry and to former
Department Director David Rivers that the "foster care program
was seriously out of compliance with D.C. Law 2-22, the
Prevention of Child Abuse and Neglect Act of 1977, which requires
neglect reports to be investigated with 24 hours of receipt."
The Auditor revealed that each month as many as 400 reports of
neglect were not being investigated in a timely manner.  As the
Auditor observed, "Sadly, each uninvestigated report represents a
child or children whose health and welfare may be at risk."

100. When Department employees do respond to reports of neglect
or abuse, they regularly fail to offer to the families any
services that might enable children to remain safely at home and
thus to avoid the need for foster care placement.  Services to
troubled families in their own homes are virtually nonexistent in
the District of Columbia, despite the requirement of federal law
that the District make reasonable efforts to avoid the need for
foster care placement for all children it takes into foster care.

Misuse of "Emergency Care"

101.    District of Columbia law permits parents to relinquish
custody of their children temporarily to the Department of Human
Services in situations in which the parents are experiencing
problems that endanger the welfare of their children.  Pursuant
to this law the Department routinely accepts children into its
"emergency care" program, but, in violation of federal and
District law, it fails to make any effort to assist parents so as
to enable them to reassume responsibility for their children.
Further, the Department then willfully fails either to return the
children to their parents or to seek legal custody from the
Superior Court within the ninety days mandated by District law.
Instead, it simply keeps children in "emergency care" unlawfully,
sometimes for years.

102.    Children whom the Department takes into "emergency care"
often disappear into the District's foster-care system for years,
deprived of the protections of federal law and of any opportunity
of being returned to their parents or of being made available for
adoption.

103.    Unlike those children for whom the Department has lawful
custody, children in "emergency care" do not receive either
independent periodic reviews or appointed counsel, to which all
children for whom the Department seeks legal custody are
entitled.

104.  As of January 1988 there were 118 children who had been in the Department's emergency care custody for more than 90 days, and 37 of those children had been in emergency care for more than one year.

105.   Many of the children who are detained unlawfully in "emergency care" are returned to their families after months or years in custody, not because either the Department or a court has decided that it is safe or appropriate to return these children, but simply because legal custody has lapsed.  Many of these children later return to foster care, after having suffered additional psychological damage and sometimes physical harm.

106.  The unlawful detention of children in "emergency care" is causing the District to forego hundreds of thousands of dollars available under the Adoption Assistance and Child Welfare Act of 1980.  To qualify for these funds for any particular child, however, the District must have initiated, within six months of assuming physical custody of the child, proceedings to obtain legal custody of the child.  According to a preliminary report issued by the federal government in February 1989, $763,209 of the federal payments to the District in fiscal years 1985 and 1986 were invalid and may have to be returned because the Department failed to comply with this requirement.

Inappropriate Placements

107.  Newborn babies who have been abandoned by their parents at area hospitals are routinely left at the hospitals by the Department well beyond the time when they are ready for discharge.  As of May 23, 1989, the Department was aware of and had failed to obtain placements for twenty-one "boarder babies" at one area hospital alone, three of whom have been there approximately six months.  Such long-term hospitalization of medically healthy babies irreparably harms them.

108.  The District of Columbia Department of Human Services routinely places infants and very young children in institutional placements for inappropriately long periods of time.  Most of these children are placed at St. Ann's Infant and Maternity Home, a congregate-care facility in Hyattsville, Maryland that, as of May 18, 1989, was caring for forty-one children who were in the Department's custody.  According to the United Way, in 1987 the average length of stay of children at St. Ann's -- virtually all of whom are children in the Department's custody -- was 56.8 days; in 1988 that figure jumped over 50% to 88 days.  Such long-term institutionalization of very young children irreparably harms them.

109.  The Department of Human Services routinely places more children in foster homes than is safe and appropriate and than is permitted by law.  District of Columbia regulations limit foster homes to no more than four children, but virtually every foster home used by the Department has more children than the

regulations permit.  As of April 12, 1989, approximately fifty percent of the Department's 365 foster homes had one child too many, another thirty percent had two children too many, and the remaining twenty percent had three or more children too many.

110.    The District of Columbia Department of Human Services does not maintain adequate placement resources for children with special needs who are in the Department's custody.  Despite the fact that the Department estimates that fifty percent of the children in its custody have special emotional, developmental, or physical needs, the Department does not operate a single specialized or therapeutic foster home nor does it provide the services or support to regular foster homes that would allow them to care for these children appropriately.  Consequently, the Department places children with special needs either in regular foster homes in which the parents are unable to care properly for the children or in overly restrictive, out-of-state, residential-care facilities.

111.    The Department has placed hundreds of children in out-of-state, residential-care institutions that are far more restrictive than is appropriate.  Further, the Department is not adequately supervising the care of the children placed in these facilities and thus has no way of knowing whether these children are being treated properly or are receiving appropriate care and services.  Finally, because these facilities -- some of which are located in Texas, Georgia, and Florida -- are located far away

from the children's families, children placed in these facilities
are being denied appropriate visitation with their families.

112.   District law mandates that defendant Marion Barry establish
a "youth residential monitoring committee" to monitor the
condition of foster children placed in residential institutions
or group facilities.   The committee is to receive quarterly
reports of each child's progress and is to conduct an annual "on-
site assessment" of each child's placement so as to assess its
appropriateness.   Defendant Barry has never established this
committee, and thus foster children who are in the Department's
custody and who are placed in residential institutions or group
facilities are not receiving the monitoring and assessments to
which they are entitled.

113.   The District of Columbia has failed to place children in
its custody in foster homes, group facilities, or institutions
that meet standards that are reasonably in accord with current
recommended standards for such institutions or homes.   Defendant
Marion Barry was required by District law to have promulgated by
August 12, 1987, regulations governing all facilities --
including foster homes -- into which the Department was placing
foster children.   However, no such regulations have been
promulgated, and thus children in the Department's foster-care
custody were in facilities for which regulations were, according
to a Department report, "severely out-dated."

Absence of Plans

114. The Department of Human Services has failed to develop legally mandated case plans for thousands of the children in its custody.  For many children in the Department's custody, no written case plans exist at all, thereby virtually assuring that handling of their cases is haphazard and impromptu and making much more likely that they will remain in foster care far longer than necessary.  For those children for whom case planning documents do exist, these "plans" fall far short of legal requirements and minimal professional standards; often they are so vague and incomplete as to be meaningless.

115.  The District of Columbia Department of Human Services has failed to provide services or to make other reasonable efforts to assure the return of children to families in situations in which the Department's planning goal is to reunite the child with his or her family and the provision of services will facilitate that reunification.  Instead, the Department routinely adopts a plan of return home for children and then fails to provide to the child or the family the services that are necessary to make possible the child's return.  Further, the Department often will return children to their parents even though no services have been provided to the parents and no basis exists for believing the problems that necessitated the original removal have been resolved.

116.  The District of Columbia Department of Human Services has failed to make reasonable efforts to facilitate the prompt

adoption of children for whom the Department has determined that
adoption is appropriate.  When the Department assigns a plan of
adoption to a child it usually does nothing to effect that plan.
Hundreds of children who have a plan of adoption have not been
referred to the Department's adoption unit for adoption matching.

117.  For those few children who are referred to the adoption
unit, the Department makes little effort to assure they are
adopted.  The Department does not employ anyone whose sole duty
is to recruit adoptive homes, and it employs just one person on a
full-time basis and one person on a part-time basis to recruit
both adoptive homes and foster homes.

118.  Once children enter the custody of the District of
Columbia Department of Human Services, they are likely to spend
most of their childhood in government custody.  The average
length of time for children in the District's foster-care system
is slightly over 57 months.  According to the most recently
available figures, the median time in care nationally is 17
months, and no other jurisdiction for which data are available
has a median time in care greater than 42 months.

Lack of Periodic Review

119.  Federal and District law mandate that a court or
independent administrative board periodically review the case of
each child in the Department's custody.  Among other things,
these reviews are to determine the continuing necessity for and
appropriateness of the child's placement, the Department's

compliance with the written case plan, the progress made towards alleviating the circumstances that necessitated the child's removal from his or her home, and the projected date for the child's return to home or placement in an adoptive home. The District of Columbia has failed to assure that children in its custody receive these mandated reviews. For many children -- those in "emergency care," for instance -- these reviews never take place. For others, reviews are held, but the Department's failure to provide to the court or administrative reviewer and to the children's representative necessary and legally mandated information in a timely manner renders the reviews meaningless.

120. Federal law also requires the District to provide each child in its custody with a "dispositional hearing" within eighteen months of the child's entering custody and periodically thereafter. Among other things, these dispositional hearings are to determine the appropriate planning goal for the child (e.g. reunification with family, adoption, long-term foster care). The District of Columbia Department of Human Services has failed to assure that children in its custody receive these required dispositional hearings.

<u>Insufficient and Untrained Staff</u>

121. The Department of Human Services has failed to maintain adequate staff to discharge its legal responsibilities. Approximately one third of the full-time social worker positions within the Department's Child and Family Services Division are vacant; this ratio of vacancies has existed since at least May 5, 1988.

122.   As a result of the Department's chronic understaffing of its social work force, the social workers whom the Department does employ have dangerously high caseloads that far exceed minimally accepted professional standards.  As of the spring of 1988 protective services workers carried average caseloads of twenty-five families and sixty seven children, intensive services workers carried average caseloads of forty five families and ninety two children, continuing services workers carried caseloads of fifty-six families and one hundred twenty-five children, and adoptions workers carried caseloads of sixty seven families.  Currently, Department social workers are carrying caseloads at least as large as these; as of March 1, 1989, one unit of four workers in the Continuing Services Branch was assigned 440 families consisting of over 900 children.

123.   High-level Department and District officials long have been aware of the Division's vacancy and related caseload problems but willfully have refused to remedy them.  In July 1988 the Chair of the Mayor's Committee on Child Abuse and Neglect wrote to defendant Marion Barry warning him of the "urgency" of the problems and reporting that "the Division has been plagued by an excessive shortage of staff.  The problem has continued to deteriorate, creating a situation that is detrimental to the safety and well-being of children and the preservation of families.  It has affected all levels of every program and service area, which adversely impacts upon the Division's ability to comply with Federal and District laws . . . ."  In a series of

memoranda (one of which was signed by 116 Child and Family
Service Division employees) issued between March and September
1988, Department supervisors and workers pleaded with high-level
Department officials, including defendant Peter Parham, to fill
staff vacancies so as to reduce the caseloads carried by
Department workers on the job.

124.   The District of Columbia Department of Human Services does
not provide adequate training to its social workers.  Newly hired
workers receive no formal or systematic training before assuming
their responsibilities, and ongoing workers receive little or no
continuing training.

125.   The Department of Human Services does not provide adequate
supervision of caseworkers.  Supervisor-worker ratios exceed
minimal professional standards, a problem seriously compounded by
the fact that many supervisors themselves carry caseloads.
According to an October 1988 statement signed by more than one-
half of the Department's supervisors, "We as supervisors have
been unable to carry out our designated function, inasmuch as we
have been forced to carry caseloads, respond to crises, make home
visits, repeatedly go to court and place children.  Thus, we are
unable to adequately supervise our staff, provide sound caseload
management and be available for consultation in complex
situations."

Primitive Information System

126.  The District of Columbia Department of Human Services does not have operating the information system required by federal law or minimal professional standards.  For instance, most information about children in the Department's custody is kept on index cards maintained by various branches within the Department. This card "system" often is inaccurate or incomplete, and thus children frequently get "lost."  Workers receive no computer or other reports that enable them to manage their caseloads, and supervisors do not receive adequate information for them to supervise their staffs.  The haphazardness of the Department's record keeping was revealed by a federal report issued in February 1989 that indicated that the Department had in its custody as many as 100 children "whose program eligibility -- and even their very existence -- could not be supported by DHS case records."  The report warned of an "alarming lack of control over case files."

127.  All of the above violations of law are the result of actions or inactions taken by the defendants acting under color or law.

## CAUSES OF ACTION

128.  As a result of the actions and inactions of the defendants, the plaintiff children are being deprived of the rights conferred upon them by the federal Adoption Assistance and Child Welfare Act of 1980 and the local plan adopted and approved as a necessary condition of federal funding under the Act.  The rights

violated by the defendants include but are not limited to the plaintiff children's right to reasonable efforts to prevent removal from their homes or to enable them to return home; their right to written case plans that contain mandated elements and to the implementation and review of those plans; their right to placement in foster homes or facilities that conform to nationally recommended standards; their right to appropriate services; their right to placement in the least restrictive, most familylike setting; their right to proper care while in custody; their right to a plan and to services that will assure their permanent placement; their right to regular judicial or administrative reviews; their right to dispositional hearings within eighteen months of entering custody and periodically thereafter; and their right to receive services in a child welfare system with an adequate information system.

129.  As a result of the actions and inactions of the defendants, the plaintiff children are being deprived of the rights conferred upon them by the District of Columbia Prevention of Child Abuse and Neglect Act of 1977.  The rights violated by the defendants include but are not limited to the plaintiff children's right to timely and reasonable investigations of complaints of neglect or abuse; their right to services to prevent removal from their homes when such is appropriate; their right not to be detained in emergency care for more than ninety days; their right to a plan that will assure the provision of services that will facilitate their prompt permanent placement; their right to prompt adoptive

placement when appropriate; and their right to sufficient staff and staff supervision to effect the Act's requirements.

130.  As a result of the actions and inactions of the defendants, the plaintiff children are being deprived of the rights conferred upon them by the due process clause of the fifth amendment to the United States Constitution.  The constitutional rights violated by the defendants include but are not limited to the plaintiffs children's right not to be harmed -- physically, emotionally, developmentally or otherwise -- while in state custody; their right to placement in the least restrictive, appropriate placement; their right to care that is consistent with competent professional judgment; and their right not to be deprived of state or federally created liberty or property rights without due process.

131.  As a result of the actions and inactions of the defendants, the plaintiff children are being deprived of the rights conferred upon them by the federal Child Abuse Prevention and Treatment Act.  The rights violated by the defendants include but are not limited to the plaintiff children's right to prompt investigation of reports of abuse or neglect; their right to protection from those who endanger their health and welfare; and their right to such administrative procedures, trained and qualified personnel, programs, and facilities that are necessary to deal effectively with child abuse and neglect in the District of Columbia.

132.   As a result of the actions and inactions of the defendants, the plaintiff children are being deprived of the rights conferred upon them by the District of Columbia Youth Residential Facilities Licensure Act of 1986.   The rights violated by the defendants include but are not limited to the plaintiff children's right to placement in properly licensed, inspected, and monitored facilities; their right to individualized treatment plans; and their right to comprehensive aftercare plans.

<u>REQUESTED RELIEF</u>

The plaintiffs respectfully request that the court grant the following relief:

133.   Certify this class as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.

134.   Enter declaratory and injunctive relief necessary and appropriate to remedy the defendants' violations of the plaintiff children's rights under the federal Adoption Assistance and Child Welfare Act of 1980.

135.   Enter declaratory and injunctive relief necessary and appropriate to remedy the defendants' violations of the plaintiff children's rights under the District of Columbia Prevention of Child Abuse and Neglect Act of 1977.

136.   Enter declaratory and injunctive relief necessary and

appropriate to remedy the defendants' violations of the plaintiff children's rights under the United States Constitution.

137.  Enter declaratory and injunctive relief necessary and appropriate to remedy the defendants' violations of the plaintiff children's rights under the federal Child Abuse Prevention and Treatment Act.

138.  Enter declaratory and injunctive relief necessary and appropriate to remedy the defendants' violations of the plaintiff children's rights under the District of Columbia Youth Residential Facilities Licensure Act of 1986.

139.  Award to the plaintiffs the reasonable costs and expenses incurred in the prosecution of this action, including but not limited to reasonable attorneys' fees pursuant to section 1988 of title 42 of the United States Code.

140.  Retain jurisdiction of this matter.

141.  Award to the plaintiffs any other relief the court deems just and proper.

Respectfully submitted,

*Christopher T. Dunn*

CHRISTOPHER T. DUNN
D.C. Bar No. 399181
Children's Rights Project
American Civil Liberties Union
132 West 43rd Street
New York, New York   10036
(212) 944-9800

*Marcia Robinson Lowry*

MARCIA ROBINSON LOWRY
Children's Rights Project
American Civil Liberties Union
132 West 43rd Street
New York, New York   10036
(212) 944-9800

*Elizabeth Symonds*

ELIZABETH SYMONDS
D.C. Bar No. 35893]
American Civil Liberties Union Fund
  of the National Capital Area
1400 20th Street, N.W.
Washington, D.C.   20036
(202) 457-0800

Of Counsel:
ARTHUR B. SPITZER
D.C. Bar No. 235960
American Civil Liberties Union Fund
  of the National Capital Area
1400 20th Street, N.W.
Washington, D.C.   20036
(202) 457-0800

Attorneys for the Plaintiffs

Dated:    June 20, 1989

47

Respectfully submitted,

CHRISTOPHER T. DUNN
D.C. Bar No. 399181
Children's Rights Project
American Civil Liberties Union
132 West 43rd Street
New York, New York  10036
(212) 944-9800

MARCIA ROBINSON LOWRY
Children's Rights Project
American Civil Liberties Union
132 West 43rd Street
New York, New York  10036
(212) 944-9800

ELIZABETH SYMONDS
D.C. Bar No. 358931
American Civil Liberties Union Fund
  of the National Capital Area
1400 20th Street, N.W.
Washington, D.C.  20036
(202) 457-0800

Of Counsel:
ARTHUR B. SPITZER
D.C. Bar No.  235960
American Civil Liberties Union Fund
  of the National Capital Area
1400 20th Street, N.W.
Washington, D.C.  20036
(202) 457-0800

Attorneys for the Plaintiffs

Dated:    June 20, 1989

47