# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

LASHAWN A., by her next friend, Evelyn )
Moore, *et al.*, )
     )
        **Plaintiffs,** )
     )
      **v.** )     **Civ. No. 89-1754 (TFH)**
     )
ADRIAN M. FENTY, as Mayor of the District )
of Columbia, *et al.*, )
     )
        **Defendants.** )
_____)

## MEMORANDUM OPINION

Pending before the Court are the plaintiffs' Renewed Motion for a Finding of Civil Contempt [Dkt. No. 910], the defendants' Motion to Establish a Definitive Timeline for Termination of the Consent Decree ("Termination Motion") [Dkt. No. 914], and the defendants' Motion to Modify Court Order Provisions Requiring that the Court Monitor Approve, or Authorizing Her to Impose or Write, the District of Columbia's Plans, Policies, or Strategies ("Monitor Motion") [Dkt. No. 924]. After hearing oral arguments on these motions and considering the parties' briefs and the relevant evidence in the voluminous record of this case, the Court will grant in part and deny in part the plaintiffs' motion, deny the defendants' Termination Motion, and grant in part and deny in part the plaintiffs' Monitor Motion for the reasons set forth below.

## I. BACKGROUND

### A. Events Leading to Liability and Consent Decree

In 1989, the plaintiffs brought this class action against the mayor and other District of Columbia officials on behalf of children who depend on the District's child welfare system,

including its foster care system, alleging numerous violations of state and federal laws.[1]  After

hearing two weeks of testimony, this Court "determined that, due to inept management and the

indifference of the mayor's administration, 'the District had failed to comply with reasonable

professional standards in almost every area of its child welfare system.'"  *LaShawn A. v. Barry*, 144

F.3d 847, 849 (D.C. Cir. 1998) (quoting *LaShawn A. v. Dixon*, 762 F. Supp. 959, 998 (D.D.C.

1991)).  The Court found "widespread and systematic deficiencies" that caused emotional and

physical harm to children in foster care as well as children who were not in the District's custody

but who were the subject of inadequately addressed reports of neglect.  *LaShawn A.*, 762 F. Supp. at

983-86.  It is not necessary to recite these troubling findings in greater detail here—suffice it to say

that the Court concluded that the District's child welfare system complied with neither "federal law,

District law, nor, for those plaintiffs in the District's foster care, the United States Constitution."  *Id.*

at 960-61.  Accordingly, the defendant officials were held liable for the District's federal, local, and

Fifth Amendment violations.  Although the District reserved the right to appeal that ruling, the

parties worked out a proposed consent decree[2] to correct the myriad deficiencies in the District's

child welfare system.  This proposal was approved and adopted by the Court as a Remedial Order

on August 27, 1991 [Dkt. No. 145].  This Remedial Order, *inter alia*, appointed the Center for the

Study of Social Policy as a Court Monitor.  Since then, the Court Monitor has kept the Court

apprised of the District's progress and related developments.  The Monitor has also has also assisted

the parties with negotiations of proposed consent orders and implementation plans.

### B. Appellate Findings and Instructions

The District appealed, arguing that this Court overstepped its bounds by reaching the

plaintiffs' federal statutory and constitutional claims.  A panel of the Court of Appeals for the

---

[1] The defendant officials are currently responsible for the care of some 2,100 children in foster care
and the supervision of over 600 children living at home.

[2] The terms "consent decree," "consent order," and "consent judgment" are used interchangeably
here.

District of Columbia Circuit held that a private right of action existed under the District's Prevention of Child Abuse and Neglect Act, such that it "provided an independent basis for supporting the district court's judgment."[3] *LaShawn A. v. Kelly*, 990 F.2d 1319, 1325 (D.C. Cir. 1993) ("*LaShawn I*"). "Accordingly, rather than reach the difficult constitutional and federal statutory questions, the *LaShawn I* panel remanded the case 'with instructions to fashion an equally comprehensive order based entirely on District of Columbia law, if possible.'" *LaShawn A. v. Barry,* 87 F.3d 1389, 1392 (D.C. Cir. 1996) (quoting *LaShawn I*, 990 F.2d at 1325). Consequently, this Court entered an 84-page Modified Final Order ("MFO") based on local law, which was virtually identical to the original order. *LaShawn A. v. Kelly*, No. 89-1754 (D.D.C. Jan. 27, 1994). The District again appealed, arguing that the MFO unlawfully "imposes requirements beyond those of District law." *LaShawn A. v. Barry*, No. 94-7044, 1996 U.S. App. LEXIS 30536, 1996 WL 679301 (D.C. Cir. Oct. 30, 1996). Reasoning "that District law is not materially less demanding than federal law," the D.C. Circuit affirmed this Court's judgment.[4] *Id.* Soon thereafter, the Court adopted an implementation plan, developed by the Court Monitor and the parties, which provided steps toward compliance with the MFO.

### C. Implementation of the Judgment: Receiverships

While pursuing appeals, the District failed to comply with the Remedial Order. Therefore, in November 1994, this Court appointed three limited receivers to manage the child welfare system's protective services, resource development, and corrective action functions. These receivers reported a "severe level of dysfunction" and concluded that the scope of their authority was insufficient to successfully implement the remedial order. *LaShawn A. v. Kelly*, 887 F. Supp.

---

[3] The D.C. Circuit also reached the implicit conclusion that the exercise of pendent jurisdiction was appropriate. *See LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996) (en banc), *see also LaShawn A. v. Barry*, 144 F.3d 847, 850 (D.C. Cir. 1998) (describing the en banc ruling).

[4] In so ruling, the D.C. Circuit surmised that this Court had determined that the substitution of District law as the basis for the decree "did not materially undermine the District's consent." *LaShawn A. v. Barry*, 144 F.3d at 850.

297, 313 (D.D.C. 1995). Concurrently, the District was faced with a financial crisis. *See LaShawn A. v. Barry*, 144 F.3d 847, 850-51 (D.C. Cir. 1998). Concerned that looming cost-cutting measures "would seriously undermine the receivers' efforts to implement the consent decree," the Court exempted certain staff members from such measures and adopted the receivers' work plans. *Id.* (citation omitted).

In May 1995, after finding pervasive areas of noncompliance and missed deadlines, the Court held the defendants in contempt and placed the child welfare system into general receivership. On appeal, the D.C. Circuit, concerned with the breadth of authority granted to the general receiver, remanded with instructions to "only authorize the Receiver to violate local law in those instances where, considering other alternatives, [the Court] specifically concludes an override is necessary to enforce the terms of the consent decree." *Id*. at 854. And, if it so concludes, "identify the specific federal law ground it is using as justification for the Receiver's authority to transcend local law." *Id.* at 855. Such measures proved unnecessary, and, in October 2000, the parties agreed to a consent order setting forth requirements to end the receivership. Citing compliance with these requirements and the District's overall improvement, the Court ended the receivership as of July 2001, subject to a probationary period.

### D. Post-Receivership Implementation & Compliance

The probationary period ended in 2003 with the entry of an implementation plan ("IP") designed to bring the District into full compliance with the MFO. The defendants raised concerns with the outcome measures described in the IP. The IP was later amended, revised, and ultimately submitted for approval pursuant to a joint motion of the parties. This "Amended Implementation Plan" ("AIP"), which describes various outcomes to be achieved by the end of 2008, was adopted by the Court on February 27, 2007, shortly after Mayor Fenty took office. Progress was observed and maintained in many areas from 2003 to 2007, although the Court Monitor expressed concern that performance in several areas had "reached a plateau." *See* Ct. Monitor Report, March 21, 2008

4-5 [Dkt No. 990]. Then, things took a turn for the worse.

On January 9, 2008, Banita Jacks' four daughters, known to the District's Child and Family Services Agency ("CFSA") by virtue of reports of suspected abuse or neglect in 2006 and 2007, were found dead in their home in the District's Eighth Ward. *See* Office of the Inspector General, District of Columbia**,** OIG No. 09-I-0029, Report of Special Evaluation: Interaction Between an At-Risk Family, District Agencies, and Other Service Providers (2005-2008) (April 2009) [Dkt. No. 1010]. Due to media attention resulting from this horrific and demoralizing discovery, calls to the District's child abuse and neglect hotline increased dramatically. Ct. Monitor Report, March 21, 2008. CFSA became overwhelmed, and the parties developed a six-month plan to stabilize the foundering agency. According to the Court Monitor, the parties also agreed to extend the compliance date for AIP outcomes to June 30, 2009. *Id.* Making matters worse, the agency's Director resigned in July 2008. Shortly thereafter, the plaintiffs filed a motion for a finding of civil contempt, alleging deteriorating performance and complaining of the defendants' failure to develop an acceptable strategy. The parties reached a temporary resolution, and the Court entered a Stipulated Order, holding the motion in abeyance, enumerating several reform efforts and consultation requirements, and requiring the defendants to produce a "strategy plan" for the 2009 calendar year. Stipulated Order, Oct. 7, 2008 [Dkt. No. 899].

Citing the Court Monitor's dissatisfaction with the defendants' proposed plan, the plaintiffs renewed their contempt motion in January 2009, adding allegations of noncompliance with the Stipulated Order. The following month, the defendants filed a Motion to Establish a Definitive Timeline for Termination of the Consent Decree, followed in March by a related Motion to Modify Court Order Provisions Requiring that the Court Monitor Approve, or Authorizing Her to Impose or Write, the District of Columbia's Plans, Policies, or Strategies. The Court addresses each of these motions in turn.

## II. RENEWED MOTION FOR CONTEMPT

In July 2008, the plaintiffs filed a motion for contempt alleging the District failed to comply with its obligations under the 1993 Modified Final Order ("MFO") [Dkt. No. 891-2] and 2007 Revised Amended Implementation Plan ("AIP") [Dkt. Nos. 861-1, 891-3]. That motion alleged some thirteen categories of violations based largely on data from April 2008. In October 2008, the parties reached agreement on the terms of a stipulation and proposed order [Dkt. No. 898], which was adopted as a Stipulated Order [Dkt. No. 899] holding the motion for contempt in abeyance, setting interim requirements, including the development of an annual "strategy plan." The defendants submitted a proposed strategy plan on January 26, 2009, followed the next day by a motion for court approval of that proposal. [Dkt. Nos. 907, 908.] On January 30, 2009, the plaintiffs, dissatisfied with the defendants' proposals, filed a renewed motion for contempt, now before the Court, wherein they incorporate their prior motion[5] (supplemented with more recent data) and assert new grounds for a finding of contempt, based on alleged violations of the Stipulated Order. The first new ground is that the District has repudiated its obligations in developing a 2009 annual strategy plan as specified under Paragraph 8 of the Stipulated Order:

> Instead of submitting to the Court a comprehensive plan, approved by the Monitor, completed in consultation with Plaintiffs, and containing specific action steps and benchmarks directed at achieving MFO and AIP compliance, Defendants have moved the Court to approve a temporary plan, not approved by the Monitor, completed without meaningful consultation with Plaintiffs, and containing virtually no specific action steps or benchmarks.

Renewed Mot. for Contempt 7 [Dkt. No. 910]. The plaintiffs further allege that the mayor appointed a new CFSA Director without consulting the plaintiffs as required by paragraph 4 of the Stipulated Order. Pls.' Reply Br. 2 [Dkt. No. 918].

---

[5] The plaintiffs reserved the right to re-initiate contempt proceedings if they were unsatisfied with the District's progress on its commitments under the Stipulated Order. Stipulated Order ¶ 1.

### A. Legal Standard

The Court has inherent power "to enforce compliance with its orders through the remedy of civil contempt." *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 16 (D.D.C. 2000); *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006). Unlike criminal contempt, which has a punitive goal, civil contempt is "a remedial sanction designed to obtain compliance with a court order . . . ." *Food Lion v. United Food Commercial Workers Int'l Union*, 103 F.3d 1007, 1016 (D.C. Cir. 1997) (quoting *NLRB v. Blevins Popcorn Co.,* 659 F.2d 1173, 1184 (D.C. Cir. 1981)); *In re Fannie Mae Sec. Litig.*, 552 F.3d 814, 823 (D.C. Cir. 2009)). Contempt is appropriate "only if the putative contemnor has violated an order that is clear and unambiguous, and the violation must be proved by clear and convincing evidence." *Broderick*, 437 F.3d at 1234. In this context, clear and convincing evidence means "a quantum of proof adequate to demonstrate to a 'reasonable certainty' that a violation has occurred." *SEC v. Bilzerian*, 613 F. Supp. 2d 66, 70 (D.D.C. 2009) (quoting *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002)).

"Furthermore, if the order contains any ambiguities, the Court must resolve those issues in favor of the party against whom contempt is sought." *Broderick v. Donaldson*, 338 F. Supp. 2d 30, 47 (D.D.C. 2004) (citing *United States v. Microsoft Corp.*, 980 F. Supp. 537, 541 (D.D.C. 1997)). The order is to be interpreted using an objective test that considers the plain language of the order and the circumstances surrounding its issuance. *Cobell v. Babbitt*, 37 F. Supp. 2d 6, 16 (D.D.C. 1999) (citing *United States v. Young*, 107 F.3d 903, 907 (D.C.Cir.1997)). "In analyzing the matter at hand, the court bears in mind that ambiguity is far less likely to be found when the order at issue was proposed and consented to by the contemnor." *Id.* (citations omitted).

Once the moving party has come forward with sufficient evidence to establish a *prima facie* case of noncompliance, the respondent carries the burden to establish a justification for the violation in order to avoid a contempt finding. *Bilzerian*, 112 F. Supp. 2d at 16. A contemnor's good faith alone is not a defense, but a party may raise good faith substantial compliance as a defense. *See*

*United States v. Shelton*, 539 F. Supp. 2d 259, 263 (D.D.C. 2008); *Food Lion*, 103 F.3d at 1017-18 (noting that "although a party's good faith may be a factor in determining whether substantial compliance occurred, and may be considered in mitigation of damages, good faith alone is not sufficient to excuse contempt"); *see also Cobell v. Norton*, 226 F. Supp. 2d 1, 23 (D.D.C. 2002), *vacated in part*, 334 F.3d 1128 (D.C. Cir. 2003). "In order to prove good faith substantial compliance, a party must demonstrate that it took all reasonable steps within its power to comply with the court's order." *Food Lion*, 103 F.3d at 1017 (citation and internal quotation marks omitted).

### B. Discussion

#### 1. The Amended Implementation Plan

The plaintiffs allege numerous violations of the AIP, which is enforceable pursuant to the MFO. MFO § XX.B.5.a. They point to over a dozen categories of noncompliance with AIP benchmarks, based largely on data from November 2008 and March 2009. *See* Pls.' Supp. Mem. [Dkt. No. 945]; *see also* Ct. Monitor Letter, March 21, 2008, Mot. For Contempt, Ex. I Appx. A [Dkt. No. 891-10] (explaining that the defendants were not in compliance with a majority of the quantitative AIP benchmarks). The defendants argue that a contempt sanction is not necessary to encourage progress because data indicate that CFSA is incrementally improving performance across the AIP outcomes. Defs.' Resp. to Pls.' Supp. Br. 3 [Dkt. No. 946]. They point largely to measures of performance as of March 31, 2009 as reported by CFSA Director Gerald. *See generally* Gerald Decl., Defs.' Supp. Br. Ex. 1 [Dkt. No. 943-1] (discussing measures of performance cited by the plaintiffs as well as national statistics as reported in January 2007). They also contend that the deadline for compliance with the AIP outcome measures was extended from December 31, 2008 to June 30, 2009, such that this motion was prematurely filed. Defs.' Supp. Opp'n Br. 3 [Dkt. No. 943]; *see also* Ct. Monitor Letter, March 21, 2008 2 [Dkt. No. 891-10]. The plaintiffs, however,

argue that such an extension was contingent on the development, by July 1, 2008, of a one-year plan acceptable to the Monitor.

Although the Court never extended any AIP deadlines, in light of the District's demonstrated efforts throughout 2008, the Court will decline to hold the defendants in contempt based on failures to meet AIP requirements that are illustrated solely by data gathered prior to June 30, 2009. *See* Ct. Monitor Report, April 30, 2009 2-3 (indicating that CFSA had largely stabilized and returned to 2007 levels of performance). Therefore, to the extent the plaintiffs' motion is grounded in alleged noncompliance with the AIP, it will be denied without prejudice.[6]

### 2. Selection of a CFSA Director

Paragraph 4 of the October 7, 2008 Stipulated Order [Dkt. No. 899] provides: "It is understood that an acceptable permanent Director, once recruited, will be hired by the Mayor of the District of Columbia and will report to the Mayor of the District of Columbia. The Court Monitor and Plaintiffs will be included in the selection process for the permanent Director." On February 10, 2009, the defendants notified the Court that Roque R. Gerald, Psy. D., who served as the Interim Director of CFSA since July 2008, was selected and nominated by the mayor to be the agency's permanent Director. [Dkt. No. 915.] The notice states that "[t]he Defendants consulted the Plaintiffs' counsel and the Court Monitor prior to selecting Dr. Gerald." *Id.* The plaintiffs dispute this claim, alleging that the defendants "undertook no legitimate or good faith consultation with Plaintiffs regarding the qualifications and attributes of an acceptable permanent director," nor did they discuss the selection of Dr. Gerald or any other possible candidates. Pls.' Reply Br. 2, 3. "Instead, shortly before Mayor Fenty's February 10 announcement, Plaintiffs' counsel received an altogether perfunctory telephone call from Attorney General Peter Nickles" informing them of the planned nomination. *Id.* The defendants' description of their efforts to include the plaintiffs is revealing:

---

[6] The District's performance is discussed in terms of certain AIP benchmarks in Section III, *infra*.

THE COURT . . . Am I to understand that . . . [the plaintiffs] have not been included in the selection?

MR. NICKELS: They will be included and given notice before we make a selection and have an opportunity to talk to the individual. If it's Dr. Gerald they would have already met him and opposed him. They will know just as they knew last time they agreed and then rejected.

THE COURT: What [does] an acceptable permanent director mean to you?

MR. NICKELS: This means, to me, a candidate that's acceptable to the mayor. It's an executive function. The mayor was selected to run this agency. He has the right to name a director. Obviously, when he names a director he will receive advice from a lot of different people.

THE COURT: The court monitor and plaintiffs being included in the selection process means to you [that] after you select a person they're allowed to talk to them?

MR. NICKELS: What it means, Your Honor, is that the mayor will make a selection and hear the comments of [the plaintiffs' counsel] and the court monitor. We already know the views of the court monitor and the plaintiffs about our current director. Does that mean we can't appoint the current director?

THE COURT: Your reading of this order does not comport with, I think, the commonsense reading of the order.

MR. NICKELS: Your Honor, there's only so much consultation you can have. . . . Does the fact that the plaintiffs don't like Dr. Roque Gerald mean that we can't select him?

THE COURT: They are not saying that.

MR. NICKELS: They know his work --

THE COURT: The order requires, as I read it, consultation. And that, it seems to me, does not mean after the fact. Additionally, the order requires an acceptable (to the court monitor) proposed annual strategic plan that was not done. . . . If you want to not follow the court order you need to file some type of motion to get relief from the Court . . . .

Hr'g. Tr. 27:9-28:25, Feb. 6, 2009.

After the nomination, the mayor's counsel, Ellen Efros of the District's Office of the

Attorney General, had an opportunity to explain the selection process before the Court:

MS. EFROS: And we believe, Your Honor, that the plaintiffs were consulted. I don't think the plaintiffs have any issue with whom we selected as the director of CFSA.

THE COURT: That is not the point. The point is whether or not the court order was obeyed that the court monitor and plaintiffs would be included in the selection process for the permanent director, obeyed in reality, not just superficially by notifying them of who you wanted to name.

MS. EFROS: I understand, Your Honor. We did try to communicate with the

plaintiffs about the selection. Whether or not that communication or involvement rises to the level of what was contemplated by the order is questionable. But again it is not -- we don't believe that in and of itself would be sufficient basis to hold the defendants in contempt here.

Hr'g. Tr. 31:1-32:9, July 13, 2009.

Ms. Efros was mistaken. The defendants argue that they substantially complied in good faith with the stipulated order. Yet they do not dispute the plaintiffs' characterization of their communications regarding the selection of a Director. A call informing the plaintiffs' counsel of the selection does not constitute inclusion in the selection process. Since the nomination was the mayor's responsibility, the Court finds that Mayor Fenty failed to comply with the clear terms of paragraph 4 of the Stipulated Order. And because the record reveals no justification for the heedless effort to comply with this simple requirement, the Court cannot find that the mayor (or other District officials) demonstrated good faith or substantial compliance with regard to paragraph 4 of the Stipulated Order.[7]

### 3. The 2009 Annual Strategy Plan

Among the requirements of the Stipulated Order is the creation, in consultation with the plaintiffs, of a 2009 annual strategy plan:

By January 15, 2009, the Defendants, in consultation with the Plaintiffs, shall complete a proposed annual strategy plan for the 2009 calendar year acceptable to the Court Monitor that contains specific action steps and benchmarks to move Defendants toward compliance with all MFO and AIP final requirements.

Stipulated Order ¶ 8 (October 7, 2008). Instead of submitting such a plan, the defendants submitted a six-month proposal[8] [Dkt. No. 907], five pages in length, which was not approved by the Court

---

[7] No criticism of Dr. Gerald is meant to be implied here. Indeed, the undersigned commends Dr. Gerald for his dedication to the District's child welfare system.

[8] The defendants did not formally seek relief from the Stipulated Order, but the Court informally granted leave for the defendants to file their plan by January 26, 2009. *See* Defs.' Opp'n to Pls.' Renewed Mot. for Contempt Ex. A [Dkt. No. 912-1].

Monitor.[9]  The plaintiffs argue that the defendants violated the order because the six-month

proposal (1) is not an *annual* plan, (2) is not acceptable to the Monitor, and (3) lacks sufficient

action steps and benchmarks.  The defendants are clearly in noncompliance with the requirement

that the proposed plan be an annual plan.  The defendants contend, however, that the parties

informed the Court Monitor that they had agreed to postpone development of an annual plan, and

would meet to discuss a six-month "bridge period," such that by doing so they substantially

complied with the order in good faith.  Ct. Monitor Letter, January 5, 2009 11 [Dkt. No. 996].  It is

clear, moreover, that the Court Monitor was concerned with this proposal for good reason—its

dearth of benchmarks and specific action steps.  *See* Ct. Monitor Mem.: Comments on 2009

Strategy Plan Proposal (March 4, 2009) [Dkt. No. 924-4]; Ct. Monitor Letter, January 26, 2009,

Renewed Contempt Mot. Ex. B [Dkt. Nos. 910-2, 997].  The Court cannot agree with Director

Gerald's characterization of the proposal as "reasonable and ambitious."  Gerald Decl. 5.  The

proposal amounts to little more than an outline, and the defendants have not provided a reasonable

justification for its lack of detail.  The defendants' lackadaisical approach to this requirement, and

their last-minute requests for adjustments, are additional grounds for concern.[10]  For these reasons,

the Court must again question whether the defendants genuinely intend to cooperate.  Due to their

failure to provide an adequate annual proposal developed in consultation with the plaintiffs by the

---

[9] This six-month proposal was superseded by the District's proposal of a one year plan to exit court supervision, which was submitted to the Court Monitor on February 24, 2009.  Monitor Mot. Ex. A [Dkt. No. 924-1]; Gerald Decl. 5.

[10] The defendants also requested that the Court refrain from ruling on the contempt motions until addressing their termination motion.  Defs.' Resp. to Pls.' Supp. Br. 1 [Dkt. No. 946].  The Court sees no reason to do so.  *See Frew v. Hawkins*, 540 U.S. 431, 438 (2004) (rejecting argument that federal court lacks power to enforce an order "unless the court first identifies, at the enforcement stage, a violation of federal law"); *see also Maness v. Meyers, J.*, 419 U.S. 449, 458 (1975) ("The orderly and expeditious administration of justice by the courts requires that 'an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings'" (quoting *United States* v. *Mine Workers*, 330 U.S. 258, 293 (1947)); *Cf. Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 286 (D.C. Cir. 1993) (it is a "well-established principle that a trial court retains jurisdiction to enforce consent decrees and settlement agreements"); *United States v. Pearce*, 792 F. 2d 397, 400 n3 (3rd Cir. 1986).

deadline, the Court finds that the defendants have failed to comply, substantially or otherwise, with the unambiguous provisions of paragraph 8 of the Stipulated Order.

### C. Conclusion

The blatant disregard for paragraph 4 described above is particularly surprising in light of the fact that the defendants *stipulated* to the order's terms, which required nothing more than genuine consultation. The contumacious posture of District officials has become a troubling theme here. *See LaShawn A. v. Kelly*, 887 F. Supp. at 299 ("[t]he remedial phase of this case has been marked by repeated cycles of noncompliance and sluggish progress"). Intransigence may be a nominal improvement from indifference**,** but it is still unacceptable in this context. The Court will hold the defendants in civil contempt for failing to comply with paragraph 8 of the October 7, 2008 Stipulated Order. The Court will further hold Mayor Fenty, as the official responsible for the appointment of the CFSA Director, in civil contempt for noncompliance with paragraph 4 of the order. The Court will not impose any fines at this time, and will instead take the measures outlined in the accompanying order.[11]

## III. MOTIONS FOR RELIEF FROM COURT ORDERS

When exercising their equitable authority, judges often face a tension between two maxims familiar to the field of medicine: *primum succurrere* ("first, hasten to help") and *primum non nocere* ("first, do no harm"). One way to craft a judgment intended to address problems without causing new ones is to invite the parties to negotiate terms of a consent decree. Such judgments have a "hybrid character, having qualities of both contracts and court orders." *Pigford v. Veneman*, 292 F.3d 918, 923 (D.C. Cir. 2002) (citation omitted); *see also Frew v. Hawkins*, 540 U.S. at 431, 437 (2004) ("A consent decree embodies an agreement of the parties . . . [that they] expect will be reflected in, and be enforceable as, a judicial decree . . . ." (citation omitted). Should a problem

---

[11] The defendants reserved the right to seek an evidentiary hearing as to the remedy. *See* Order (May 7, 2009) [Dkt. No. 941].

with a prospectively applicable decree later arise, a party may move the Court to amend, vacate, or otherwise grant relief from it accordingly. FED. R. CIV. P. 60. Here, the defendants bring two motions to amend consent orders pursuant to Federal Rule of Civil Procedure 60(b)(5).

### A. Legal Standard

Rule 60(b)(5) states, in pertinent part: "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding . . . [if] the judgment has been satisfied . . . or applying it prospectively is no longer equitable . . . ." The Rule is an avenue for demonstrating that significantly changed circumstances warrant reexamination and modification of an order. *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) (Cardozo, J.) ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need."). "Modification of a consent decree may be warranted" when: (a) "changed factual conditions make compliance with the decree substantially more onerous," (b) "when a decree proves to be unworkable because of unforeseen obstacles," or (c) "when enforcement would be detrimental to the public interest." *Rufo v. Sheriff of Suffolk County*, 502 U.S. 367, 384-85 (1992) (citations omitted). It is not, however, a vehicle for relitigating underlying violations or for challenging a ruling. *Horne v. Flores*, 557 U.S. ___, 129 S. Ct. at 2579, 2593 (2009); *see also id.* at 2619 (Breyer, J., dissenting) (the Court is not required to "retrace old legal ground, say, by re-making or rejustifying its original constitutional decision every time an effort is made to enforce or modify an order" (citation, internal quotation marks and brackets omitted)); *see also Rufo*, 502 U.S. at 390 ("[A] consent decree is a final judgment that may be reopened only to the extent that equity requires"). "[A] party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 393.

The leading Supreme Court opinion discussing Rule 60(b)(5) in the institutional reform context is *Horne v. Flores*, 129 S. Ct. 2579 (2009). In *Horne*, the Court explained:

> [T]he Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest. The party seeking relief bears the burden of establishing that changed circumstances warrant relief, but once a party carries this burden, a court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes. Rule 60(b)(5) serves a particularly important function in what we have termed "institutional reform litigation." For one thing, injunctions issued in such cases often remain in force for many years, and the passage of time frequently brings about changed circumstances-changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights-that warrant reexamination of the original judgment.

129 S. Ct. at 2593 (internal quotation marks and citations omitted). The Court continued:

> [I]n recognition of the features of institutional reform decrees, we have held that courts must take a "flexible approach" to Rule 60(b)(5) motions addressing such decrees. A flexible approach allows courts to ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant. In applying this flexible approach, courts must remain attentive to the fact that federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation. If [a federal consent decree is] not limited to reasonable and necessary implementations of federal law, it may improperly deprive future officials of their designated legislative and executive powers. For these reasons, a critical question in this Rule 60(b)(5) inquiry is whether the objective of the . . . . declaratory judgment order . . . has been achieved. If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper.

*Id.* at 2594-95 (internal quotation marks and citations omitted). "This inquiry . . . . takes the original judgment as a given and asks only whether 'a significant change in factual conditions or in law' renders continued enforcement of the judgment detrimental to the public interest." *Id.* at 2596-97 (quoting *Rufo*, 502 U.S. at 384); *see also id.* at 2615-16 (Breyer, J., dissenting).

### B. The Consent Orders

As discussed above, the Modified Final Order ("MFO") was negotiated by the parties and entered as a consent decree in 1993. The decree implements various statutes in some detail, reflecting a choice among various ways they could be implemented. *Cf. Frew*, 540 U.S. at 438. The MFO is also a set of remedial and prophylactic measures intended to ensure that officials fulfill their responsibilities to the District's most vulnerable residents. It requires the Court Monitor to

develop an implementation plan with the active participation of the parties. MFO § XX.B. An implementation plan must specify, among other things, "steps and tasks necessary to achieve compliance with the [MFO]," which must be updated every six months. MFO § XX.B.3.b. An implementation plan is binding on the parties as part of the MFO, which provides: "the [parties] waive any rights they may have to challenge any aspect of any such plan and agree to be bound by the plan." MFO §§ XX.B.4, XX.B.5.a. The plaintiffs further agreed "not to seek judicial relief for technical, *de minimus* violations" of the MFO or the implementation plan. MFO § XX.F.3. Full compliance was expected by the end of 1995, MFO § XX.B.5.b, and the MFO accordingly envisions a procedure for ending court supervision: "The Monitor shall serve until the court determines, upon defendants' application, that the Monitor is no longer necessary." MFO § XX.A.3.

The implementation plan adopted in 2003 (the "IP") established interim benchmarks to be achieved by December 2006. Despite the MFO's waiver provision, the defendants sought to "reserve their right to raise objections to the outcome measures and to demonstrate, at an appropriate time, that they are in compliance with the MFO prior to achieving each of the threshold or 'fully' compliant levels set forth in the [IP]." Defs.' Resp. to Proposed Implementation Plan 3, May 5, 2003 [Dkt. No. 804]. Compliance was not achieved in 2006, and the parties worked together in early 2007 to develop an amended implementation plan (the "AIP"). Consent Mot. to Enter Proposed Consent Order (Feb. 15, 2007) [Dkt. No. 861]. The Court adopted the AIP, which was intended to "govern implementation of child welfare reform under the [MFO] through December 31, 2008." AIP preamble. In the AIP, the parties reserved "whatever rights and objections they have previously asserted in response to the [IP]." *Id*. In addition to specifying various outcomes, the AIP includes an annual "Strategy Plan" and various "action steps" that "are enforceable by the Court but can be changed or deleted with the approval of the Court Monitor." AIP 17. It further provides that the Strategy Plan "will be updated annually in consultation with the

Plaintiffs and the Court Monitor and is subject to approval by the Court Monitor." *Id.* The Court Monitor did not approve of the defendants' 2009 proposed plan, as required by the October 7, 2008 Stipulated Order. Ct. Monitor Mem., Feb. 12, 2009 ("Comments on Latest Versions of District's Six Month Plan"); *see also* Ct. Monitor Mem., March 4, 2009 ("Comments on February 24, 2009 Strategy Plan Proposal") [Dkt. No. 929-3]. On March 13, 2009, the defendants submitted a revised proposal to the Court along with their motion to modify the Court Monitor's authority. Monitor Mot. Ex. A [Dkt. No. 924-2].

### C. Motion to Establish a Definitive Timeline for Termination of the Consent Decree

In their Motion to Establish a Definitive Timeline for Termination of the Consent Decree ("Termination Motion") [Dkt. No. 914], the defendants request that the Court set forth a definitive timeline to end court supervision and terminate the consent decree within one year, and "adopt specific exit criteria narrowly designed to address any remaining District law violations [with a brief time period for monitoring exit criteria]."[12] Termination Mot. 1, 31. "At the very least," they add, "this Court should discharge all provisions of the consent decree except those designed to remedy an ongoing statutory violation, including any provision related to a violation that has now been cured." Defs.' Reply to Pls.' Supp. Br. 1. Because the defendants fail to demonstrate that a significant change in circumstances warrants the relief requested, the Court will deny their motion.

In support of their Termination Motion, the defendants argue that "the District is now in statutory compliance," Mot. 3, and "[b]ecause the District is now in compliance . . . *Horne v. Flores* requires that the consent decree be dissolved." Defs.' Reply to Supp. Br. 2 [Dkt. No. 949]. Alternatively, even if "statutory compliance remains in [*sic*] issue, it is no longer equitable that the consent decree have prospective effect given significantly changed circumstances—namely, the complete transformation of the District's child welfare system in the past decade." *Id.* They add,

---

[12] The motion also included a request to approve the District's six-month plan, which was rendered moot by the defendants' later submission of a proposed annual plan.

"it is inappropriate for a federal court to continue to oversee the responsibilities of local officials based on non-systemic violations of local statutes." *Id.* at 17; *see also* Monitor Mot. 23 (". . . it is inequitable for the Court's orders to remain in effect beyond this calendar year."). Essentially, they contend that they have achieved substantial compliance, and that they can be reasonably expected to achieve full statutory compliance within one year, such that relief from the MFO is appropriate. Indeed, they claim that the Court's supervision is now doing more harm than good. Termination Mot. 2.

### 1. Discussion

In *Horne*, the plaintiffs sued the State of Arizona under the Equal Education Opportunities Act ("EEOA") for failing take "appropriate action to overcome [students'] language barriers." *Id.* at 2589-90. Finding the funding allocations for English-Language-Learner ("ELL") instruction to be arbitrary, the district court held the defendants in violation of the EEOA. *Id.* The court entered a declaratory judgment, followed by several injunctions to ensure adequate funding. *Id.* Later, the state passed legislation that changed the ELL funding scheme, which, among other things, provided for structured English immersion, a different pedagogical approach to ELL instruction. *Id.* at 2590-91. Arguing that this new legislation constituted a significant change in circumstances, the state moved for relief under Rule 60(b)(5). The district court denied the motion and the Ninth Circuit affirmed. *Id.* at 2591. The Supreme Court reversed and remanded the case, holding that the lower courts misapprehended the EEOA and misapplied the flexible standard for Rule 60(b)(5) motions set forth in *Rufo v. Sheriff of Suffolk County*, 502 U.S. 367 (1992) by failing to consider whether the state "is now fulfilling its statutory obligation by new means." *Id.* at 2589.

For their part, the plaintiffs contend that *Frew v. Hawkins,* 540 U.S. 431 (2004) is controlling. In *Frew*, parents of children eligible for certain Medicaid services alleged that Texas' Medicaid program did not comply with federal law. The district court entered a consent decree, which the plaintiffs moved to enforce two years later, arguing that state officials failed to fully

comply with its requirements. The district court agreed. The Fifth Circuit reversed, concluding that the district court lacked jurisdiction under the *Eleventh Amendment*. The Supreme Court reversed, holding that the decree is a "federal court order that springs from a federal dispute" such that its enforcement lawfully "vindicates an agreement that the state officials reached to comply with federal law," *id.* at 438-9, even if it requires the defendants to "take some steps that the statute does not specifically require." *Id.* at 439.

Although this case differs from both *Frew* and *Horne*, each is instructive. Here, as in *Frew*, a consent decree is the subject of the motion. Notably, *Horne* did not involve a consent decree, and did not disturb the principle described in *Local No. 93 v. City of Cleveland*, 478 U.S. 501, 525 (1986), and observed in *Frew*, that a consent decree may "provide[] broader relief than the court could have awarded after a trial." *Local No. 93*, 478 U.S. at 525; *Frew*, 540 U.S. at 439; *see also Rufo*, 502 U.S. at 391. Unlike *Frew*, however, the question here is whether the decree is prospectively *equitable*, not whether it is enforceable.

To answer this question, it is appropriate to consider whether the objectives of the decree have been achieved. *See Horne*, 129 S.Ct. at 2595; *see also Rufo*, 502 U.S. at 381, 384; *Bd. Of Educ. v. Dowell*, 498 U.S. 237, 247-49 (1991). In *Horne*, the objective was compliance with the EEOA. *Horne*, 129 S. Ct. at 2595. So, the Court turned to the EEOA and found two particularly relevant statutes. One embodied the mandate upon which the judgment was based. *See id.* at 2597 ("Of course, any educational program, including the 'appropriate action' mandated by the EEOA, requires funding, but funding is simply a means, not the end."). Another was the EEOA's express limitation on court-ordered remedies. *Id.* at 2595 (stating that ". . . the EEOA itself limits court-ordered remedies to those that 'are *essential* to correct particular denials of equal educational opportunity or equal protection of the laws'") (emphasis in original) (quoting 20 U.S.C. § 1712). Notably, no similar statutory restriction is applicable here. Indeed, in stark contrast, CFSA's enabling statute states that: "The provisions of this subchapter are intended to be consistent with all

- 19 -

outstanding orders of the United States District Court in the *LaShawn A, et al. v. Anthony Williams, et al.*, case." D.C. Code § 4-1303.02a(f) (2009); *see also* D.C. Code § 4-1303.03a (2009).

The declaratory order and injunctions at issue in *Horne* also differ significantly from the consent decree and implementation plan at issue here. In *Horne*, the district court ordered the state to "prepare a cost study to establish the proper appropriation to effectively implement ELL programs," set a deadline for the provision of funding, and ultimately imposed a schedule of fines that "escalated from $500,000 to $2 million per day" for each day the state failed to comply with the funding order. *Horne*, 129 S. Ct. at 2590 (citations and internal quotation marks omitted). Here, the MFO leaves the District with a great deal of latitude in achieving its general requirements via "phased implementation plans" that are to be periodically updated. MFO § XX.B.

With respect to the nature and scope of the decree, this case is more like *Rufo v. Sheriff of Suffolk County*, wherein the Supreme Court announced the flexible approach applied in *Horne*. In *Rufo*, inmates of the Suffolk County Jail sued state and local officials, alleging that they were being held under unconstitutional conditions. The district court agreed and enjoined the defendants from housing an inmate awaiting trial with another inmate. Several years later, problems persisted to the point where the court of appeals ordered that the jail be closed unless a plan to create an adequate facility for pretrial detainees was adopted. Thereafter, the district court entered a consent decree, which included an architectural program for a new jail based on a projected population of 229 inmates. By the time construction began, the prisoner population had increased significantly, and the court modified the decree to provide for 453 cells. Shortly thereafter, the Sheriff moved to modify the decree to permit double-bunking in 197 cells, asserting that a recent Supreme Court decision clarified that such arrangements are constitutionally permissible. Despite these changed circumstances, the district court denied the motion, and the court of appeals affirmed. On *certiorari*, the defendant petitioners argued that the district court could not enforce the consent decree beyond those constitutional requirements. The Supreme Court rejected that argument,

explaining:

> To save themselves the time, expense, and inevitable risk of litigation, petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires (almost any affirmative decree beyond a directive to obey the Constitution necessarily does that), but also more than what a court would have ordered absent the settlement. . . . To hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation. The position urged by the petitioners would necessarily imply that the only legally enforceable obligation assumed by the state under the consent decree was that of ultimately achieving minimal constitutional prison standards . . . . Substantively, this would do violence to the obvious intention of the parties that the decretal obligations assumed by the state were not confined to meeting minimal constitutional requirements.

*Rufo*, 502 U.S. at 389-90; *see also Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986) ("a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial"); *Suter v. Artist M.*, 503 U.S. 347, 354 n.6 (1992) ("parties may agree to provisions in a consent decree which exceed the requirements of federal law"); *Frew*, 540 U.S., at 437 ("a federal consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based") (citations and quotation marks omitted).

Here, the consent decree's general purpose is to "ease the plight of children who depend on [the District] for protection and for the opportunity to live and grow in a stable and nurturing environment." *LaShawn A. v. Kelly*, 990 F.2d 1319, 1321 (D.C. Cir. 1993). As recounted above, it was crafted by the parties and ordered by the Court to address myriad deficiencies and conditions that violated federal and local law,[13] and was later upheld as a remedy for violations of local law.[14]

---

[13] Specifically, the Prevention of Child Abuse and Neglect Act of 1977 (the "Abuse and Neglect Act"), D.C. Law 2-22 (Sept. 23, 1977), the Youth Residential Facilities Licensure Act of 1986, D.C. Law 6-139 (Aug. 13, 1986), and the CFSD Manual of Operations (Sept. 1985).

*LaShawn A. v. Barry,* 87 F.3d 1389, 1391 (D.C. Cir. 1996); *see also LaShawn A. v. Dixon*, 762 F. Supp. 2d 959, 968-80 (D.D.C. 1991). Notably, the D.C. Circuit upheld the decree even assuming that it "imposes requirements beyond those of District law." *Id.*; *see also* Termination Mot. 27 (suggesting that "local officials in charge of institutional litigation" agreed to do "more than that which is minimally required by the [applicable law] . . . ." (citation omitted)).[15] Keeping this in mind, the Court will consider whether, as a result of changed circumstances demonstrated by the defendants, the District is now in enduring compliance with the mandates underlying the consent decree. *Cf. Horne*, 129 S. Ct. at 2598 (noting the importance of up-to-date factual findings).

### 2. Changed Circumstances and Unforeseen Obstacles

The defendants argue that significant changes—"namely, the complete transformation of the District's child welfare system" have occurred over the past decade that warrant modification of the MFO and related orders. Defs.' Reply to Supp. Br. 2 [Dkt. No. 949]. Modification is appropriate "when a decree proves to be unworkable because of unforeseen obstacles." *Rufo*, 502 U.S. at 384. While such obstacles must be unexpected, they need not be entirely unforeseeable in order to justify relief. *Evans v. Williams*, 206 F.3d 1292, 1298 (D.C. Cir. 2009). The Court here considers the circumstances and events that the defendants claim warrant the requested modifications and prompt dissolution of the MFO.

### a. Structural Changes

The defendants list a panoply of "structural changes" in support of their argument that

---

[14] The Court assumes that the same analysis is appropriate regardless of the nature of its subject matter jurisdiction. Naturally, Rule 60 does not apply to state or local courts, which may wield a different range of equitable powers than a federal court.

[15] The parties have not discussed the extent that the defendants' motion amounts to a challenge to the D.C. Circuit's 1996 ruling. The District's argument inescapably suggests that *Horne* has implicitly overruled that opinion, however, since a challenge to prior rulings in this case would not otherwise be cognizable under Rule 60(b)(5). *See Horne*, 129 S. Ct. at 2593 ("Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests."). This Court does not find the Circuit Court's ruling to be abrogated nor does it find continued enforcement of the MFO to be improper.

"changed circumstances" warrant relief. Termination Mot. 23-27. They describe several legislative and administrative developments, including the elevation of CFSA to a cabinet-level agency,[16] *id.* at 24, the unification of the investigation system, *id.*, the promulgation of new regulations for foster homes, *id.* at 26, and the creation of a Family Court for the District of Columbia, *id.* at 27. They point out that CFSA now has lower caseloads, an advanced case tracking system, and a 24-hour hotline that can record and retrieve calls. *Id.* at 25-6. They also note that CFSA conducts internal quality assurance monitoring and is subject to review by the U.S. Department of Health and Human Services as well as the D.C. Council. *Id.* at 26-7. Finally, the defendants highlight an increase in the number of attorneys dedicated to abuse and neglect cases. *Id.* at 27.

Similar arguments were raised in *NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 36 (D.C. Cir. 2000). There, an employer sought termination of a consent decree, arguing that such relief was warranted in light of personnel changes and an internal reorganization, among other things. *Id.* The court agreed that Harris Teeter had "promptly complied" with most, but not all, of the decree's requirements. *Id.* at 35. The court reasoned, however, that:

> compliance over an extended period of time is not in and of itself sufficient to warrant relief. . . [P]arties who have successfully sought modification have also established events or changed circumstances which "make compliance with the decree substantially more onerous," make the decree "unworkable because of unforeseen obstacles," or make "enforcement [of the decree] detrimental to the public interest.

*Id.* The court explained that "[i]nternal compliance mechanisms instituted to effectuate the decree . . . . and hurdles inherent in a consent decree's entry do not count as 'obstacles'" under *Rufo*. *Id.* at 35-6. The Court denied the motion, emphasizing that the movants had not claimed that any circumstance or obstacle "makes the decree unworkable." *Id.* at 36.

The defendants here have similarly neglected to explain how any alleged changes make the decree "unworkable." Such an explanation is required by *Rufo*, even in the institutional reform

---

[16] CFSA was formerly the Child and Family Services Division of the Department of Human Services ("CFSD").

context, though the burden should be lighter than in *Harris Teeter*, which did not involve a government institution. *See id.* at 35. Moreover, some of the measures taken by the District (e.g., the 24-hour hotline, case tracking system, and reduced caseloads) are required by the MFO, and as such do not constitute unforeseen circumstances that warrant relief under Rule 60(b)(5). *See id.; see also Rufo*, 502 U.S. at 385. Furthermore, the defendants merely mention other "structural changes," without discussing actual impacts, and without alleging any new policy insights. By contrast, the movants in *Horne* provided detailed descriptions of the state's implementation of a "structured English immersion approach," along with academic research papers supporting the new approach. *Horne*, 129 S. Ct. at 2586. For these reasons, the Court finds that the defendants have failed to demonstrate significantly changed circumstances justifying modification.

### b. Economic Hardship

The defendants further argue that the District's projected revenue shortfall of $802 million for fiscal year 2010, or "some 15% of the District's annual budget in local funds" is an unforeseen obstacle that warrants relief.[17] Defs.' Opp'n Br. 20 [Dkt. No. 922]. They note that CFSA allocated $615,550 for 2009 and that monitoring imposes other costs "by consuming the time and resources of government lawyers and officials." Termination Mot. 29. Financial constraints are a legitimate concern. *See Rufo*, 502 U.S. at 392-3; *see also Missouri v. Jenkins*, 495 U.S. 33, 51 (1990). The costs of monitoring, however, are not properly considered to be obstacles. *See Agostini v. Felton*, 521 U.S. 203, 216 (1997) (holding that anticipated costs of compliance with an injunctive order are not changed circumstances under *Rufo*); *see also Rufo*, 502 U.S. at 385; *Harris Teeter*, 215 F.3d at 36. Moreover, the defendants have not shown projected costs to be *unworkable* or even

---

[17] It bears noting that the District experienced severe financial hardship in 1995, well before the terms of the IP and AIP were negotiated. *See generally LaShawn A. v. Barry*, 144 F.3d at 850-51.

superfluous, nor have they provided a specific proposal for addressing the shortfall. Therefore, the Court finds that they have failed to demonstrate that financial circumstances warrant modification.[18]

### 2. Statutory Compliance

The defendants contend that the District has achieved statutory compliance "in a full range of areas" and "is making effective and appropriate efforts" in the "few remaining areas where legal compliance can be improved."[19] Termination Mot. 3. They do not claim that the statutes the consent decree is intended to effectuate have materially changed.[20] Neither do they allege any particular provision of the MFO to be inappropriate, unreasonable, or aimed at eliminating conditions that are not unlawful or do not flow from a violation of law. Nor do they allege that any of the AIP or MFO requirements are inconsistent with District policies or prospective policies. Rather, they argue that they have substantially achieved the outcomes set forth in the AIP, and that the AIP's requirements inappropriately exceed statutory requirements, notwithstanding their consent to its terms. The defendants make this claim even though they worked with the plaintiffs and the Court Monitor to develop the AIP, and jointly submitted it for Court approval three years

---

[18] The accompanying order invites discussion of budgetary or funding issues at the next status conference.

[19] The defendants state that applicable local statutes provide "no [] precise standard or particular percentage that defines legal compliance. Nor would the district ever be able to show perfect compliance." Defs.' Supp. Br. 9. It is true that most of these statutes provide no specific criteria; but from this observation, the defendants take a startling leap: "Substantial compliance, not exact compliance, is the appropriate measure." *Id.* (citing *R.C. v. Walley*, 390 F. Supp. 2d 1030, 1044 (M.D. Ala. 2005)); *see also id.* at 9-10 ("The proper focus here is on correction of systemic violations of law, not whether every problem has been corrected." (citing *R.C. v. Walley*, 475 F. Supp. 2d 1118, 1144 (M.D. Ala. 2007))). This supposition, immediately familiar to anyone driving a bit over the speed limit, is based on a misreading of *R.C. v. Walley*. *R.C.* involved a consent decree that expressly provided "'substantial compliance' [as] the governing standard for termination." *Id.* at 1043. The opinion does not suggest it as a standard for ascertaining statutory compliance. Additionally, on this point, the defendants' position is at odds with *Horne. See Horne*, 129 S. Ct. at 2589 ("The question at issue . . . is not whether Arizona must take 'appropriate action' [as required by the EEOA] . . . . Of course it must.").

[20] The Court invited and received supplemental briefs "addressing whether and how the District today remains in violation of the local statutes upon which the Court made its original findings of liability, and whether as a matter of law statutory compliance would nullify the consent decrees in this case." Order, May 7, 2009 [Dkt. No. 941].

ago, during Mayor Fenty's administration. They point out that the District filed "objections" to the IP and the AIP, arguing that many of the benchmarks "mandate performance at ninety percent or higher which is an unrealistic level of compliance and is beyond any compliance level that can be mandated by law."[21] Termination Mot. 18 n.3, 19 n.4. Regardless, the AIP is intended to bring the District into compliance with the MFO, which has been upheld based on local statutes whose terms remain in force. Therefore, the defendant's argument either assumes that the D.C. Circuit ruling upholding the MFO was abrogated by *Horne* or that the AIP goes beyond the requirements of the MFO such that they should not have consented to its terms. Because the AIP's Strategy Plan applied only through 2008 (or, as extended, June 30, 2009), the defendants claims regarding the AIP are moot. However, in light of legislative changes other developments since the entry of the MFO, the Court will take this opportunity to discuss the MFO, as implemented via the AIP, in context of the current statutory framework. *Cf. Horne*, 129 S. Ct. at 2586-87 (explaining that new legislation may constitute a "potentially significant changed circumstance") (citation and internal quotation marks omitted).

The defendants support their motion primarily by comparing the Court's 1991 findings with 2008 or 2009 data, describing the comparison as "the most resounding demonstration possible that the District is taking appropriate action to comply with its duties under applicable statutes." Defs.' Reply to Pls.' Supp. Br. 10.[22] To be sure, the plaintiffs similarly cherry-pick the data discussed in

---

[21] Based on these objections, the defendants contend that they "have <u>never</u> consented to those benchmarks . . . ." (emphasis in original). Termination Mot. at 23-24. Notably, the parties waived such objections in the MFO, MFO § XX.B.4, and the defendants did not characterize their filing as an objection, although they did raise this concern regarding IP outcome measures, Defs' Resp. to Proposed Implementation Plan 3, May 5, 2003 [Dkt. No. 804]. The defendants clearly consented to the AIP's terms, but since the AIP acknowledges prior objections, these filings may be relevant to whether the decree's continued operation is equitable.

[22] The defendants also contend that the plaintiffs have conceded compliance in five areas because the plaintiffs failed to specifically address those areas in their supplemental brief. Defs.' Supp. Reply Br. 9. (The plaintiffs provided four "illustrative examples." Pls.' Supp. Br. 18.) The Court finds no concession here, particularly in light of the fact that the defendants bear the burden of persuasion.

their briefs, fighting overstatement with oversimplification. These analyses are not very revealing, partly because they say very little about the sustainability of recent performance levels. Fortunately, the record is supplemented by the Court Monitor's data and commentary. The Court need not address each category of activities or responsibilities enumerated in the consent orders to resolve the pending motions, particularly with respect to areas where the parties' analyses are cursory (e.g., provision of continuing or preventive services,[23] periodic reviews,[24] and monitoring foster homes[25]). Instead, the Court will herein focus on six areas addressed by the parties: timeliness of investigations, case planning, voluntary placement, adoption, and system infrastructure.

### a. Timeliness of Abuse and Neglect Investigations

In 1991, the Court found that CFSD had "failed to initiate investigations into reports of neglect or abuse within 24 hours and complete investigations within two weeks" in violation of D.C. Code § 6-2102(b) (1981 ed.) and § 301.15 of the CFSD Manual of Operations. 762 F. Supp. at 968-69. Similarly prompt initiation is required today: "[Investigations] shall commence (1) Immediately upon receiving a report of suspected abuse or neglect indicating that the child's safety

---

[23] *See* D.C. Code § 4-1303.03(a)(3) (2009) (CFSA must "maintain a program of treatment and services for families of neglected and abused children including services designed to help children, where safe and appropriate, return to families from which they have been removed"). The AIP requires, among other things, medical and dental evaluations within 30 days of placement. AIP § 24(b). It further requires that CFSA provide documentation of Medicaid coverage within five days of placement, and Medicaid cards within 30 days of placement. AIP § 24(c). For children with a reunification goal, the AIP also sets visitation requirements. AIP §§ 10 (caseworker-parent visits); 20(b) (sibling visits); 11 (child-parent visits). The defendants do not allege these requirements to be inconsistent with CFSA policy.

[24] In various circumstances where a child is placed outside of the home, their status must be periodically reviewed. D.C. Code. § 4-1301.09(d)(2); *see also id.* § 16-2323 (requiring permanency and review hearings in family court for children in foster care). In addition to projecting a date for return or permanent placement, such a review must assess the child's safety, the appropriateness of the placement, and compliance with the case plan. *Id.* § 4-1301.09(e)(1).

[25] Facilities providing foster care in the District (and any CFSA foster home, regardless of its location) must be periodically licensed and inspected. D.C. Code §§ 4-217.02, 7-2103, 7-2105. In 2001, the District promulgated regulations governing the licensing of foster homes for abused or neglected children. *See generally* CDCR §§ 29-6000 et. seq.

or health is in immediate danger; and (2) As soon as possible, and at least within 24 hours, upon receiving any report not involving immediate danger to the child." D.C. Code § 4-1301.04(b) (2009); *see also id.* § 4-1301.04(c) (delineating requirements for the initial phase of an investigation); CFSA Investigations Policy (Sept. 30, 2003) Ch. 1000 § 7.A.4.g (requiring face-to-face contact with alleged child victim within 24 hours of receiving report). Investigations must be completed within 30 days, D.C. Code. § 4-1301.06(a) (2009), and CFSA employees have five days after the completion of an investigation to complete a final report. *Id.* at § 4-1301.06(c). The AIP is consistent with these statutes. *See* AIP §§ I.A.1.a (requiring initiation of investigation within 48 hours), I.A.1.b (requiring investigations to be completed within 30 days). The defendants claim that they have achieved compliance with these requirements. They also note, understandably, that timeliness must not be achieved at the expense of quality or safety. Defs.' Resp. to Pls.' Supp. to Renewed Mot. for Contempt 4 (discussing length of investigations) [Dkt. No. 946].

Specifically, the defendants allege that, as of March 31, 2009, CFSA initiated or attempted to initiate 91% of investigations within 48 hours, which would meet the AIP benchmark. Gerald Decl. 6 [Dkt. No. 943-1]. The plaintiffs dispute this, alleging that only 72% of investigations were timely initiated as of March 2009 and only 74% were completed on time. Pls.' Supp. Br. 18-19. The defendants contend that this discrepancy arises from cases where an investigator attempts but fails to locate the child, which are not counted as initiated until the child is actually contacted. Defs.' Supp. Reply Br. 11-12; Gerald Decl. 6. The record does not reveal the methodology used to measure good faith attempts. Lacking such information, the Court cannot determine whether these attempts amount to initiation within the meaning of the AIP or the D.C. Code.[26]

---

[26] In a review of forty investigations conducted in March 2007, the Court Monitor found that 31 were timely initiated, three included sufficient good faith efforts to meet the AIP initiation standard and six "did not meet the standard of being initiated within 48 hours." Ct. Monitor Report, April 30, 2009 28 (citing Ct. Monitor Report: An Assessment of the Quality of Child Abuse and Neglect Investigative Practices in the District of Columbia (Nov. 14, 2007)). A similar qualitative review is forthcoming.

The defendants also attribute other discrepancies between their data and the plaintiffs' data to different measurement methodologies. For instance, they contend that the District does not consider an investigation completed until the report is written, and based on a 35-day time period, investigations are timely completed and closed investigations over ninety percent of the time. Hr'g Tr. 23:1-11 (July 20, 2009). The defendants also explain that "from January 1, 2009 to March 31, 2009, there were a total of 1,608 investigations, of which 462 cases had been open greater than 30 days, with a median of 33 days to closure." Defs.' Supp. Reply to Pls.' Contempt Mot. 4. Finally, they emphasize that, despite amassing a backlog that rose to 1,759 cases in June 2008, CFSA reduced the backlog to 40 by April 2009. *Id.* (citing Ct. Monitor Report, April 30, 2009 29-30 [Dkt. No. 998]). The Monitor has applauded CFSA's recovery from early 2008, when reports indicate that only 56% of investigations were timely initiated, and only 17% were timely completed. Indeed, it appears that, with regard to timeliness of investigations, CFSA has returned to or surpassed its 2007 levels of performance. This does not amount to compliance with the District's unambiguous statutes, however. Even assuming that it did, in light of CFSA's 2008 performance, the defendants have not shown that compliance is sufficiently likely to persist.[27]

b. Case Planning

District law requires the prompt preparation of a case plan for each child for whom there is a substantiated report of abuse or neglect. D.C. Code § 4-1301.09(b) (the agency "shall, as soon as possible, prepare a plan for each child and family for whom services are required on more than an emergency basis and . . . take such steps to ensure the protection of the child and the preservation, rehabilitation and, when safe and appropriate, reunification of the family . . . ."). A case plan must be "consistent with the best interests and special needs of the child" and be designed to place him or

---

[27] According to data validated by the Court Monitor, 71% of investigations were timely initiated as of November 2007. This figure fell to 56% as of April 2008, but rose to 75% as measured in January 2009. According to the Monitor, 55% of investigations were completed within 30 days as measured in November 2007. This figure plummeted to 17% in April 2008, but rose to 74% in January 2009.

her in the "least restrictive and most appropriate setting available." *Id.* § 4-1301.09(d)(1). Among other things, it must include a plan for the child's safety and care, assuring the availability of services to improve conditions in the parents' home, facilitating the child's return home or permanent placement, and a description of the appropriate type of home or institution for placement. D.C. Code § 4-1301.02(3); *see also id.* § 1301.09a (requiring "reasonable efforts" to reunify families). If reunification is not possible, CFSA must ensure the child's timely permanent placement, consistent with such a plan. D.C. Code § 4-1303.01a.

The AIP requires permanency goals to be consistent with District law as well as the Adoption and Safe Families Act of 1997 ("ASFA"), Pub. L. 105-89, 111 Stat. 2115 (1997) (amending 42 U.S.C. §§ 671-675). Under the AFSA, a child may be assigned one of five goals at a permanency hearing. Among these is the category of Another Planned Permanent Living Arrangement ("APPLA"), which is the least preferred option and requires documentation of a "compelling reason for determining that it would not be in the best interests of the child to follow one of the four [other] options." 45 C.F.R. § 1355.20. The MFO predates AFSA, but the defendants allege no inconsistency with the general permanency goals outlined in the MFO (APPLA falls within the MFO category of "continued foster care").

In 1991, the Court found that the District "consistently failed to place children in the least restrictive placements consistent with their needs." 762 F. Supp. at 972. This District also "consistently failed to prepare written case plans" and that the plans for children in its foster care often contained inappropriate goals. *Id.* at 973-74. CFSA now routinely develops case plans in a timely manner. Ct. Monitor Report, April 30, 2009 13 (95% timely in April 2008 and 97% in January 2009). CFSA's case planning quality measures, however, show "inconsistent results." Ct. Monitor Report, April 30, 2009 3, 13. The Monitor's 2007 qualitative analysis of investigations revealed significant improvements in investigation standards together with persistent deficiencies in

information gathering, training, and risk assessment that affect the quality of case planning.[28]  *See generally* Ct. Monitor Report: An Assessment of the Quality of Child Abuse and Neglect Investigative Practices in the District of Columbia (Nov. 14, 2007).  Despite CFSA's use of permanency goals consistent with the ASFA, in the most recent Quality Service Review, reviewers found 60% of case plans to contain acceptable strategies or reasoning, and acceptable implementation in 50% of cases.  Quality Service Review: Children and Families Served by the District of Columbia Child and Family Services Agency, CSSP (April 2009) 9-12.  The Court Monitor has repeatedly expressed concern about the "high number of children and youth with a goal of [APPLA]."  Ct. Monitor Report, April 30, 2009 67.  Teenagers deemed unlikely to be adopted, return home, or obtain guardianship are often assigned a goal of APPLA.  Many grow up in foster care and exit at the age of 18 or 21 without a stable home, a disposition associated with higher rates of unemployment, homelessness, incarceration, and mental health problems.  *Id*.  CFSA has sought to reduce the number of children with an APPLA goal, in part with the assistance of the Annie E. Casey Foundation Strategic Consulting Group ("CSCG").  In November 2007, there were 833 children with an APPLA goal, amounting to 37% of all children in the District's custody.  According to CSCG, this percentage dropped to 21% in early 2008, but remained above the national average of 14%.  *Id*.  In 2008, under Dr. Gerald's leadership, CFSA took action by disallowing the automatic assignment of APPLA as a goal and increasing reviews for youth on track to "age out" of the system.  These measures are encouraging, but the extent to which the District is in compliance with statutory case planning requirements remains unclear.

### c. Foster Care: Voluntary and Emergency Placement

Within ninety days of removing a child from home, CFSA must either return the child home or request the filing of a neglect petition.  D.C. Code § 4-1303.03(a)(2).  Where CFSA takes custody pursuant to the request of an agreement with a parent or guardian (a "voluntary

---

[28] An updated analysis is forthcoming.

placement"), the appropriate time period is even shorter. CFSA Investigations Policy (Sept. 30, 2003) Ch. 1000 § 7.L.1 (requiring a determination that the need for care shall not exceed 21 days). The defendants identify no inconsistencies with the MFO, which requires that such emergency care be limited to 21 days, unless an extension is duly approved. MFO § IV. In 1991, the Court found that children routinely languished in voluntary or emergency care, including the captioned plaintiff, LaShawn A., who was in voluntary care for two-and-one-half years. *LaShawn A.*, 762 F. Supp. at 971. The District now accepts voluntary placements only in rare circumstances. Indeed, as of December 2008, no children were in voluntary placements. Termination Mot. 11. The Court is satisfied that compliance with these statutes, as well as MFO § IV ("Emergency Care") has been achieved. *See* Ct. Monitor Report, July 19, 2006 40; *see also* Birdsong Decl., Termination Mot. Ex. A 6.

### d. Adoption

In 1991, the Court emphasized CFSD's noncompliance with its mandate to "prepare a permanent plan" for children that cannot be timely returned to their home, and its own policy requiring children with a goal of adoption to be referred within three days to the branch responsible for recruiting adoptive parents. 762 F. Supp. at 975. Where reunification is not feasible, CFSA must "take steps to implement a permanent plan of adoption or an alternative permanent plan for the child," D.C. Code § 4-1303.03(b)(3), and ensure "timely permanent placement consistent with the . . . plan," *id.* § 4-1303.01a(b)(11). Among these steps is a judicial procedure that involves filing a motion for termination of parental rights ("TPR") so that a child can be legally adopted.

The AIP requires the District to make all reasonable efforts to ensure that children with a permanency goal of adoption are in an approved adoptive home within nine months, and that placements in an approved adoptive home are finalized within one year. AIP § 16. TPR petitions and judicial proceedings more generally are merely part of the means here; the end is successful placement in a home. Recognizing this, the District has taken new initiatives on this front over the

past two years, such as CFSA's "Permanency Opportunity Project."[29]  The Court is confident that such efforts will facilitate the demonstrable achievement of the statutory goal of case plans that are properly designed and executed.  Unfortunately, the record does not yet indicate the extent to which these efforts help identify and establish permanency resources.  *See, e.g.* Defs.' Status Report on 2009 Annual Plan 9.

The defendants aver that legal action is timely initiated by the District, and a majority of children with a goal of adoption (499 in total as of October 31, 2009) are placed within nine months.  Data validated by the Court Monitor indicates that legal action is timely initiated in 84% of adoption cases as of January 2009.  Ct. Monitor Report, April 30, 2009 12.  Yet the same data indicate that only about half of children with a goal of adoption were in pre-adoptive placement within nine months.  *Id.*; Ct. Monitor Report, June 11, 2009 9 [Dkt. No. 1000].

Furthermore, of the thirty five children who had adoptions finalized in the last quarter of 2008, twenty six had waited in their approved adoptive home for over one year for the process to conclude.  *Id.* at 75.  Overall, the Monitor has observed a decline in adoptions since 2005, despite an improvement in the timeliness of legal action.[30]  Ct. Monitor Report, April 30, 2009 72.  In sum, the record indicates that efforts to encourage more timely filings have succeeded, and that this improvement has not resulted in more timely placements.

The defendants, on one hand, attribute some progress to the creation of the Family Court for the District of Columbia,[31] stating that it has "vastly improved collaboration with the Court."

---

[29] CFSA has also established a new website with information for prospective foster parents or adoptive parents: **http://adoptDCkids.org**.

[30] The defendants indicate that this trend has turned around, pointing to figures in a recent status report.  Defs.' Status Report on 2009 Annual Plan [Dkt. No. 1018-1] 9 ("128 adoptions were finalized in calendar year 2009, 26 more adoptions than were finalized in calendar year 2008 . . . ."). In their discussion of performance data generally, and these data in particular, the parties rarely point to helpful descriptive statistics.  Raw numbers are valuable, but additional information (e.g., percentages), tends to help put them in context.

[31] The Family Court Act of 2001 created the Family Court of the D.C. Superior Court and imposes a One-Family-One-Judge case management model.

Termination Mot. at 27 (citation omitted). On the other hand, they explain that, after the District's Office of the Attorney General ("OAG") takes legal action to terminate parental rights ("TPR"), the District "must rely on other actions in the child welfare system, such as the Family Court, to move the adoption process forward." Defs.' Reply 10. According to the District, as of February 2009, there were "364 TPR petitions pending before the Family Court. Of these petitions, 156 are officially being held in abeyance by the Court, including 96 in which an adoption petition is pending. The Family Court has currently scheduled less than a third of the pending TPR petitions for a pretrial conference or a trial." *Id.* (citations omitted). Andrew Reese, Deputy Attorney General for the OAG Family Division, explains and describes a resulting "catch-22" scenario:

> [t]he DC child welfare legal community and most family court judges are historically resistant to moving on the government's motions to terminate parental rights until an adoptive home has been identified for a child. Concern is regularly expressed about creating 'legal orphans.' It is, however, significantly easier to recruit pre-adoptive homes for children who have been legally freed for adoption. This concern about creating 'legal orphans' can leave the child in limbo . . . .

Reese Decl. ¶ 13, Defs' Reply Br. Ex. I.

The defendants note that their proposed Strategy Plan "offers additional strategies to improve adoption outcomes." Termination Mot. at 11. None of those strategies address this problem, however.[32] *See* Monitor Mot., Ex. A 5-6, 12. The fact that CFSA cannot control the Family Court offers no solace to children waiting for adoptive placement or to the honorable citizens hoping to welcome a child into their family (or, for that matter, parents hoping that a child has found safety and opportunity in a new home). This quandary in the Family Court may be an impediment to placement, but the defendants must make reasonable efforts to ensure timely placements nonetheless. Despite recent, encouraging steps to facilitate timely filing and review of

---

[32] More recently, Chief Judge Lee F. Satterfield of the Superior Court of the District of Columbia has made efforts to ensure timely TPR processing. *See* Sup. Ct. A. Order 10-04: Timeline for Resolution of Motions to Review Magistrate Judges' Decisions in Neglect, Guardianship, Adoption and Termination of Parental Rights Matters (March 9, 2010), *available at* http://www.dccourts.gov/dccourts/docs/10-04.pdf.

TPR petitions, the Court cannot conclude based on the relevant evidence in the record that the defendants have demonstrated compliance with the AIP or the statutes governing permanent placement.

### e. System Infrastructure

The defendants contend that the Court's 1991 "system infrastructure findings . . . regarding case tracking, caseloads, supervision, and training . . . were not based on a specific statutory requirement and thus cannot be bases for continuation of the consent decree." Mot. at 16 (citing 762 F. Supp. 976-9). This contention is simply incorrect. The Court's 1991 findings in this regard were based not only upon the federal Adoption Assistance and Child Welfare Act of 1990 and the defendants' stipulations, but upon local law. *LaShawn A.* 762 F. Supp. at 976-9 ("Federal *and District* law contain requirements pertaining to case tracking, caseloads, supervision, and training") (emphasis added). As the Court explained,

> District law requires the maintenance of a Child Protection Register to index cases of abused and neglected children and assist in the treatment of those children. D.C. Code. Ann. § 6-2111. District law also requires CFSD to have "sufficient staff, supervisory personnel, and resources to accomplish the purposes of the Abuse and Neglect Act, including the capacity to provide emergency and continuing service resources to abused and neglected children and their families." *Id.* at § 6-2122(c).

*Id.* at 964 (brackets omitted). These mandates persist today. D.C. Code §§ 4-1302.01 et. seq. (Child Protection Register); 4-1303.02a(d) (recodifying former § 6-2122(c)); 4-1303.02a(e) ("[s]taff qualifications, caseload levels, and supervision requirements of [CFSA] in the public and private delivery of services shall be guided by nationally accepted standards of best practice . . . .").

Finally, with regard to training, the plaintiffs have alleged several areas of noncompliance with AIP requirements. The defendants explain that much of CFSA's staff "were pulled to support reducing the investigations backlog" such that "most did not have an opportunity to complete the required in-service training hours." Defs.' Resp. to Pls. Supp. Br. 8; Gerald Decl. 6-7. The 2009 Strategy Plan proposal includes a goal of integrating their investigations practice model with the

California Social Work Education Center Curriculum. Defs.' Strategy Plan 11. The Court Monitor has not confirmed the implementation of this measure, and has expressed concern over CFSA's persistent failure "to reliably track and monitor the training experience of the entire child welfare workforce and the training of foster and adoptive parents." Ct. Monitor Supp. Mem., Dec. 22, 2009; *see also* Ct. Monitor Mem.: Comments on 2009 Strategy Proposal, March 4, 2009 8-9. Adequate training is critical, as highlighted by the Inspector General's conclusion that, in the Jacks case, "despite a clear allegation of child neglect, CFSA did not act upon any of the information provided by the . . . hotline caller." OIG Report 14.

### 3. Good Faith Compliance for a Reasonable Period of Time

The defendants contend that, since the end of receivership, they have demonstrated "good faith compliance with the Court's orders for a reasonable period of time." Defs.' Supp. Br. 5 (quoting *Dowell*, 498 U.S. at 247); Termination Mot. 17-22. The movants' good faith efforts are an appropriate consideration. *See Dowell*, 498 U.S. at 249. The plaintiffs argue that this alone is not sufficient to warrant modification, particularly where the District has failed to meet the benchmarks outlined in the AIP, because many MFO and AIP provisions explicitly require "full compliance." Pls.' Opp'n Br. 21, 23 (citing MFO § XX.B(5)(b)); *see also R.C. v. Walley*, 475 F. Supp. 2d 1118, 1123 (M.D. Ala. 2007) ("termination of a consent decree is not appropriate unless the decree's purposes have been fully achieved") (citation and internal quotation marks omitted); *see also Johnson v. Sheldon* 2009 U.S. Dist. LEXIS 90050, *24 (M.D. Fla. Sept. 30, 2009) (denying the defendant's motion to exit the consent decree because the objective of the decree had not been achieved despite "sweeping modifications and improvements to the community mental health system"). The defendants are correct that the Court may accept a level of compliance that falls short of these benchmarks as sufficient (especially in light of significantly changed circumstances), even over the plaintiffs' objection. *See United States v. Western Elec.*, 46 F.3d 1198, 1205 (D.C. Cir. 1995); *see also McDonald v. Carnahan*, 109 F.3d 1319 (8th Cir. 1997). However, they have

shown no reason why the Court should do so.  *Cf. NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 34-35 (D.C. Cir. 2000) ("Relieving a party from its obligations under a final judgment 'is an extraordinary remedy, as would be any device which allows a party . . . to escape commitments voluntarily made and solemnized by a court decree'") (citation omitted).

According to the defendants, "a review of the history of this case – post receivership – reflects a record of collaboration and cooperation by the District in seeking to meet the concerns presented by the plaintiffs, the Monitor and the Court."  Termination Mot. 6 n.2.  Unfortunately, in light of the District's refusal to abide by the simplest provisions of the Stipulated Order, the Court cannot find that a period of good faith has persisted.  Nor has the District achieved, let alone established a period of consistent compliance with, many of the AIP goals.  The District has achieved compliance with portions of the MFO, but, as explained in the next section, the Court declines to take a piecemeal approach to modification here.

### 4. The Proposed Modification

The defendants ask the Court to "adopt specific exit criteria narrowly designed to address any remaining District law violations."  Termination Mot. 1, 31.  Yet they have not proposed a modification tailored to the alleged changed circumstances.  *See Rufo*, 502 U.S. at 383 ("[i]f the moving party meets [the changed circumstances] standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstances"); *see also Salazar v. District of Columbia*, No. 93-452, 2010 U.S. Dist. LEXIS 14418, *23 (D.D.C. Feb. 18, 2010). Indeed, they offer no specific proposals at all, beyond a year-end deadline.  Alternatively, they request that the Court "discharge all provisions of the consent decree except those designed to remedy an ongoing statutory violation, including any provision related to a violation that has now been cured."  Defs.' Reply to Pls.' Supp. Br. 1.  This request appears to be based on an exceedingly broad reading of *Horne*, where the district court's order was designed to secure compliance with a single statute.  Here, the MFO is designed to ensure compliance with multiple statutes, and the

Court is neither obligated nor inclined to rewrite such an order each time the defendants fall into compliance with a part of it. *Cf. Johnson v. Sheldon*, 2009 U.S. Dist. LEXIS 90050, *24 (M.D. Fla. Sept. 30, 2009).[33] The defendants have not demonstrated a basis for revision, but even if they had, the Court lacks an adequate proposal to consider. *See Rufo* 502 U.S. at 391 ("A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor"); *Frew v. Hawkins*, 401 F. Supp. 2d 619, 634-35 (E.D. Tex. 2005), *aff'd sub nom. Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006).

### 5. Sustainability

The flexible standard set forth in *Rufo*, and reaffirmed by *Horne*, requires the moving party to show that a "durable remedy" has been implemented. *Horne*, 129 S. Ct. at 2595. This may be accomplished by showing that the objectives of the order or decree have been "attained," *Frew*, 540 U.S. at 442, and that it is unlikely that the prohibited conditions or actions will recur, *Dowell*, 498 U.S. at 247-48 (requiring defendants to show that "it was unlikely that the school board would return to its former ways"). *See Horne*, 219 S. Ct. at 2618 (Breyer, J., dissenting) (where the requested relief "amounts to having a 'decree set aside entirely,'" the movant must show "that it is unlikely, in the absence of the decree, that the unlawful acts it prohibited will again occur") (quoting *Frew,* 540 U.S. at 442)).

To satisfy their burden of demonstrating the durability of implemented remedies, the defendants contend that, under the leadership of CFSA's "new senior management," the "structural reforms" discussed above "ensure that the agency's improvement is durable and self-sustaining. Through quality assurance monitoring and its automated case-tracking system, the agency is now able to identify problems when they arise. As a cabinet-level agency, CFSA also has the resources

---

[33] Although the District is in compliance with MFO § IV, the defendants have not indicated any problem with its continuing operation. (The Court Monitor ceased examining compliance with § IV several years ago.) Absent the plaintiffs' consent or a concrete reason to strike it, the Court will decline to strike MFO § IV.

and infrastructure to respond promptly and decisively to address any issues so identified." Defs.' Reply to Pls.' Supp. Br. 19 [Dkt. No. 949]; *see also* Defs.' Reply to Pls.' Notice of Supp. Auth. 5 [Dkt. No. 1008]. These conclusory statements constitute almost the entirety of the defendant's discussion of sustainability.[34]

As the defendants emphasize, the District made significant strides between 2001 and 2007, and the child welfare system has transformed since 1991. The events of 2008 revealed significant weaknesses, however. The defendants nonetheless brought this motion just over a year removed from the tragic discovery of the decomposing bodies of four girls who received no help from CFSA.[35] By all accounts, CFSA largely fell to pieces in the aftermath of that discovery. Yet the defendants provide no discussion of lessons learned from 2008, training measures, or any other indicia of sustainability in support of their motion.[36] Ct. Monitor Report, April 30, 2009 91-93.

Undoubtedly, CFSA has taken measures to buttress reforms. But the defendants have not illustrated any, at least not in a manner that inspires enough confidence to support a conclusion that the agency's progress is "durable and self-sustaining." The Court Monitor, relying in part on data from one of the very quality assurance initiatives the defendants refer to, has observed "multiple examples of inconsistent performance over time, suggesting that long-term sustainability of

---

[34] Curiously, the District has provided a more detailed discussion of the durability of remedies in similar briefs in other institutional reform cases. *See, e.g., Evans v. Fenty*, Case No. 76-293, Defs.' Mot. to Vacate 14-51 (Oct. 7, 2009); *Dixon v. Fenty*, No. 74-285, Defs.' Mot. to Vacate and Dismiss 10-32 (Sept. 4, 2009).

[35] It bears noting that these children were four of at least nine children "known to CFSA" within their last four years who died in 2008 as a result of abuse at home. Ct. Monitor Report, April 30, 2009 11, 91-2. Those nine were among 65 children so known to CFSA who died in 2008. (The CFSA Child Fatality Committee reviews the circumstances of such tragedies and measures the "known to CFSA" category as the number children who were brought to the attention of or otherwise touched by CFSA within four years of their death.) This figure was 44 in 2007 and 55 in 2006.

[36] In their subsequent motion, the defendants mention, in general terms, two 2009 training efforts, without further description. Monitor Mot. 15-16. They also indicate progress in terms of following the general strategies outlined in their 2009 Strategy Plan proposal, but their claims in this regard have not been validated by the Court Monitor. *See* Defs.' Status Report (Sept. 2, 2009) [Dkt. No. 957-1]; Ct. Monitor Letter, Dec. 22, 2009.

progress has not been achieved." Ct. Monitor Report, April 30, 2009 3, 26-34 [Dkt. No. 998]; *see also id.* at 5 ("CFSA is still unable to routinely track and/or provide reliable data on performance" with regard to several responsibilities). Consistent with this view is the independent consultant's report,[37] quoted here at length:

> Last year was a particularly troubling one for CFSA with its crisis in investigations followed by significant turnover in leadership and throughout the agency, setting back even further its progress on well-being and permanency outcomes for children and youth. . . . Even before the 2008 investigations crisis, the fact that CFSA's case practice needs sustained attention is well documented in the federal CFSR, the most recent Quality Service Review (QSR), the federal monitoring reports and the reports of many of the other experts and consultants deployed in DC over the past several years. Suffice it to say that there is consensus among these experts that DC needs to improve its safety outcomes, the quality of its investigations, its provision of health and mental health services to children in care, improve stability while children are in placement, and ensure many more of its children and youth achieve permanency and achieve it in a timely fashion. . . . Tackling challenges of this magnitude is an enormous undertaking, but this work is essential to any reasonable construction of a successful reform of child welfare. It goes to the heart of how a functional system operates to improve the lives of the children and families which it serves . . . .

Kevin Ryan, Public Catalyst Group Pres. Mem., April 15, 2009.

Due principally to the defendants' failure to demonstrate durable statutory compliance, the Court will deny their Termination Motion.

### D. Motion to Modify the Court Monitor's Authority

The defendants' most recent motion seeks modification of the MFO, AIP, and Stipulated Order provisions concerning the Court Monitor's preparation of implementation plans (including the "2009 annual strategy plan"). The motion includes a general request that MFO provisions that "authorize the Monitor to impose requirements, write and/or plan for the District, or require her approval of the District's plans, policies, and strategies" be "modified to a consultative requirement only." Monitor Mot. 4, 24; Defs.' Reply 10. The defendants also request the addition of the following blanket provision in the AIP as well as the Stipulated Order:

---

[37] Pursuant to the October 7, 2008 Stipulated Order, the District hired the Public Catalyst Group to provide an assessment and recommendations. The group engaged CFSA from October 15, 2008 to January 15, 2009.

Any other provision of this Court's orders which required or authorized the Court Monitor to approve, impose, or write the District of Columbia's plans, polices, or strategies to reform, operate, or continue to improve its child welfare system shall be modified to require and/or authorize consultation only.

Monitor Mot. 5.

### 1. The Modified Final Order and the Amended Implementation Plan

The MFO requires the Monitor to develop implementation plans with the active participation of the parties.  MFO § XX.B.  Section III of the AIP includes action steps "designed to achieve safety, permanency, and well-being for children and to reach and sustain . . . performance goals."  AIP 17.  The defendants seek relief from the following AIP provision:

The action steps are enforceable by the Court but can be changed or deleted with the approval of the Court Monitor.  The Strategy Plan will be updated annually in consultation with the Plaintiffs and the Court Monitor and is subject to approval by the Court Monitor.

*Id*.  According to the defendants, the Monitor's planning responsibility "usurps the legitimate functions of the political branches" and provides the Monitor with "veto power over the executive's actions."  Monitor Mot. 9-10.  They further allege, in a conclusory fashion, that the Monitor "slows down the agency's ability to plan its operations, delays its ability to make changes in response to dynamic events or conditions, and adds a layer of procedural difficulties that may prevent timely action."  *Id.* at 16.  The defendants further argue that the MFO in general, and the Monitor's authority in particular, is "contrary to the public interest" because it "depriv[es] [the District's] citizens of a voice, through their elected officials, in the operation of their government."  Monitor Mot. 8 (citing *Frew*, 540 U.S. at 431).[38]

The Court finds the defendants' complaints to be unfounded, and their arguments unavailing, especially in light of the D.C. Council's intent to harmonize CFSA's authorities and

---

[38] The defendants also claim that the Court Monitor's authority "to impose, write or approve CFSA's plans or policies is not narrowly tailored to cure a violation of law," and that the Court Monitor "has acted in a manner that is inconsistent with her role as a quasi-judicial officer." Monitor Mot. 3, 7.  The Court finds these assertions to be unsubstantiated and without merit.

directives with orders in this case. D.C. Code § 4-1303.02a(f) (statutes regarding prevention of child abuse and neglect are "intended to be consistent with all outstanding orders [in this case]"). Since the end of receivership, District officials have operated the child welfare system, including CFSA. Neither the MFO nor the AIP substitute for the District's policies or regulations,[39] nor do they permit the Court Monitor to override local law. In fact, the requirement for an annual strategy may be met chiefly via discussion of plans for implementing or administering District regulations or policies. Despite the defendants' complaints, they do not provide a single example of a conflict, beyond the Court Monitor's criticisms of the proposed 2009 Strategy Plan. Nor do they explain how the Monitor causes delays. If the defendants aim to pursue a strategy inconsistent with the MFO or AIP, they may request leave to do so. Recognizing the need for flexibility, the AIP provides for amendment or deletion of action steps with Court Monitor approval. AIP 17. The defendants do not allege that the Monitor has ever denied such a request. Although they bear the burden of persuasion, the defendants again rely on conclusory statements instead of demonstrating an actual problem. Rather than deny the motion entirely on that basis, however, the Court will take the actions outlined below.

### 2. The October 7, 2008 Stipulated Order

As discussed above, Paragraph 8 of the Stipulated Order provides:

> By January 15, 2009, the Defendants, in consultation with the Plaintiffs, shall complete a proposed annual strategy plan for the 2009 calendar year acceptable to the Court Monitor that contains specific action steps and benchmarks to move Defendants toward compliance with all MFO and AIP final requirements.

---

[39] Indeed, the MFO required the creation of many of those policies and procedures, and several CFSA policies embrace the AIP. *See, e.g.*, CFSA Investigations Policy (Sept. 30, 2003) Ch. 1000 § I, *available at* http://cfsa.dc.gov/cfsa/lib/cfsa/policymanualpdffiles/policies/program - investigation (final).pdf; CFSA Family Team Meetings Policy (Feb. 13, 2007) § I, *available at* http://cfsa.dc.gov/cfsa/lib/cfsa/policymanualpdffiles/policies/program - family team meetings (final).pdf. With regard to certain neighborhood-based services, the D.C. Code also specifically requires compliance with the AIP. *See D.C. Code* § 4-1303.03a.

Since the Monitor refused to approve their proposed plan, the defendants seek relief from this provision.  Essentially, they ask the Court to relieve them of the requirement that the plan be acceptable to the Monitor, and that the Court adopt or endorse their proposed plan.

The terms of the Stipulated Order were negotiated by the parties in October 2008, less than seven months before the defendants filed this motion.  There has been no election since then.  Mayor Fenty consented to these terms, even while Dr. Gerald served as the interim CFSA director.  Therefore, the Stipulated Order does not raise the same dead hand control-like concerns as older institutional reform judgments might.  *Cf. Horne*, 129 S. Ct. at 2594 ("Injunctions of this sort bind state and local officials to the policy preferences of their predecessors . . . .").  Moreover, it specifically references "compliance with all AIP final requirements."  The proposed annual plan, while an improvement over the six-month plan initially submitted by the defendants, consists largely of vague process goals and contains only a handful of specific action steps and benchmarks.  *See, e.g.*, Defs' Strategy Plan Proposal, Monitor Mot., Ex. A 12 [Dkt. No. 924-2] (planning to improve placement stability only by setting "a reasonable percentage target for reducing placement changes").

"Rule 60(b)(5) provides that a party may obtain relief from a court order when 'it is no longer equitable that the judgment should have prospective application,' not when it is no longer convenient to live with the terms of a consent decree."  *Rufo*, 502 U.S. at 383.  Yet all that the defendants have shown here is that they are inconvenienced by their promises.  Absent the plaintiffs' consent, or some other, more compelling circumstances, the Court cannot not find prospective enforcement of this provision to be inequitable.  *Cf. NLRB v. Harris Teeter Supermarkets,* 215 F.3d 32, 35 (D.C. Cir. 2000); *Frew v. Hawkins*, 401 F. Supp. 2d 619, 636 (E.D. Tex. 2005) ("A Rule 60(b) motion is not a vehicle by which Defendants may disregard the voluntary obligations contained in the consent decree, allow time to pass, and then litigate the underlying claims in hopes of never actually complying with . . . its terms"); *see also Johnson v.*

*Sheldon*, 2009 U.S. Dist. LEXIS 90050, *24 (M.D. Fla. Sept. 30, 2009); *cf. United States v. Jupiter Aluminum Corp.*, 2009 U.S. Dist. LEXIS 83807, *31 (N.D. Ind. Sept. 14, 2009) (noting that a movant "is not entitled to Rule 60(b)(5) [relief] just because it is disappointed with the consequences of the settlement") (citing *McCormick v. City of Chicago*, 230 F.3d 319, 327 (7th Cir. 2000)).

### E. Conclusions of Law

It bears repeating that neither the MFO, nor the AIP, nor the Stipulated Order was unilaterally imposed upon the defendants—the parties negotiated the terms of these documents and jointly submitted them for court approval. Unlike the AIP and Stipulated Order, however, the MFO was submitted almost two decades and several administrations ago. Although the defendants have not demonstrated any harm from the Court Monitor's authority to enter plan updates, the Court is mindful of potential issues. Such authority is not necessary to facilitate entry of a new plan. It also raises potential federalism and separation of powers concerns, *see Horne*, 129 S. Ct. at 2593, even if they are not fully applicable here, *see* D.C. Code § 4-1303.02a(f). *Cf. Dixon v. Barry*, 967 F. Supp. 535, 552 (D.D.C. 1997) ("where the local authority's failure to comply with court orders provides no factual basis for respecting the local authority, the court need not withhold use of its equitable powers based on the theoretical principles of federalism and comity" (citations omitted)). Therefore, the accompanying order relieves the Court Monitor of responsibility for submitting the next implementation plan.[40] The order instead requires the parties to develop and submit a detailed proposal to the Court, which will provide a fresh opportunity for the defendants to suggest sensible "exit criteria."

For the reasons stated above, the Court finds that the defendants have not demonstrated that any other modification of the MFO would be in the public interest. For the time being, the Court

---

[40] The accompanying order accomplishes this by amending MFO § XX.B, which will amount, in practical terms, to a partial grant of the defendants' motion.

Monitor will continue to provide valuable oversight and objective analyses. Due to the applicable timeframes and the Court's resolution of other requests, the defendants' requests for modification of the AIP and the Stipulated Order, as well as their implied request that the Court adopt their proposed annual strategy plan are moot. To the extent that their motion seeks to otherwise modify the Court Monitor's role, it will be denied.

The Court is mindful of the Supreme Court's admonition that it must "exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is promptly returned to the State and its officials." *Frew*, 540 U.S. at 442. Sadly, on this record, the Court cannot conclude that the objectives of the consent decree have been achieved. Nor can it find that the defendants have met their burden of demonstrating that the decree's prospective application is inequitable, even applying the flexible approach countenanced by the Supreme Court. Lacking a crystal ball, the Court cannot responsibly dictate the timeline that the defendants desire. Therefore, to the extent the defendants seek a "definitive timeline" or a date certain for the termination of court supervision, it must deny their Rule 60(b)(5) motion. Any other holding would represent an unwarranted triumph of hope over experience.

## IV. CONCLUSION

Extensive litigation on these motions has changed little. Although the District's child welfare system has improved drastically from the dismal state it was once in, the defendants have yet to deliver a fully satisfactory child welfare system. This conclusion should not overshadow the diligent and thoughtful efforts the defendants, employees, foster parents, adoptive parents, and other participants in that system, which have accomplished a great deal over the past nine years. But the fragility of that progress and the persistence of several shortcomings were gravely illustrated two years ago. While the consent decree is not a permanent intervention, supervision must persist until the defendants demonstrate that the District reliably satisfies its responsibilities. The accompanying

order is intended to facilitate such a demonstration in the foreseeable future by setting the stage for a new implementation plan.  Recent efforts within the child welfare system leave the Court optimistic; there are several reasons to believe that such a demonstration will be possible, perhaps even in the next eighteen months.  Therefore, despite the aforementioned difficulties and tragedies, and the hurdles that lie ahead, the undersigned believes that this plan will constitute the first pages of the final chapter of this case.

For the reasons stated above, the plaintiffs' Renewed Motion for Contempt will be granted in part and denied in part, the defendants' Termination Motion will be denied, and the defendants' Monitor Motion will be granted in part and denied in part.

An order accompanies this memorandum opinion.

April 5, 2010

_____/s/_____.
THOMAS F. HOGAN
UNITED STATES DISTRICT JUDGE